**CORRIE CORPORATION OF CHARLES-TON, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 10629.**

United States Court of Appeals Fourth Circuit.

Argued Feb. 7, 1967.

Decided March 7, 1967.

---

Samuel D. Lopinsky, Charleston, W. Va., for petitioner.

Joseph C. Thackery, Attorney, N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Attorney, N. L. R. B., on brief), for respondent.

Before SOBELOFF, BOREMAN AND WINTER, Circuit Judges.

WINTER, Circuit Judge:

Corrie Corporation of Charleston (the "Company") was determined by the Board to have violated the National Labor Relations Act, as amended, 29 U.S. C.A. § 151 et seq. in several respects. The discharge of employees Carl Neal, Steven Matthews, and Robert O. Pen-

nington was found to violate sub-subsections (3) and (1) of § 8(a) of the Act; the Company's president, George Corrie, was found to have violated § 8(a) (1) of the Act by interrogating and threatening employee Owen Haynes; and the Company was found to have violated § 8(a) (5) of the Act by refusing to bargain with the union[1] after the discharge of the three employees previously named. The Company was ordered to reinstate the discharged employees with back pay, and to cease and desist from discouraging union membership by discharging union members because of such membership, from refusing to bargain, from coercively interrogating employees about union activity and generally from interfering with, restraining or coercing employees in the exercise of their rights under the Act.

Cross petitions to review and set aside, on the one hand, and to enforce, on the other, the Board's order present the familiar issue as to whether the Board's findings of fact, on which the various aspects of its order are premised, are supported by substantial evidence when the record is considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, (1951). Our examination of the record satisfies us that the requisite evidentiary basis was present, and we will grant enforcement of the order.

The company was a family owned and controlled corporation. George Corrie was president and Thomas Corrie, his son, was vice-president, treasurer and general manager. The Company was engaged in the wholesale hardware and building supply business in Charleston and Parkersburg, West Virginia, at the time of the events complained of. The Company was also preparing to open a new sales facility in Nitro, West Virginia, and this was opened a little over three weeks after the discharge of Neal, Matthews and Pennington. The Charleston store, where approximately eleven persons were employed (two salesmen and their supervisor, one or more office employees, five shop and warehouse employees and Ernest Casdorph, determined by the Board to be the supervisor of the shop and warehouse employees), was the situs of the alleged unfair labor practices allegedly practiced on the shop and warehouse employees at that facility. Further facts will be stated in connection with the specific violations that the Board found to have been established.

### Section 8(a) (3) and (1) Violations

Neal, Matthews and Pennington were discharged April 22, 1965. Evidence of an invidious reason for their discharge was circumstantial; evidence of permissible discharge, however, was offered by the Company. Summarized, the record showed that they were three of the five shop and warehouse employees. Two of them had been told several weeks before their discharge that the opening of the new store at Nitro would mean a lot of overtime for them; the third was told that he could transfer to Nitro, as he had requested, if the managers of the new store approved.

On April 19, Neal evidenced interest in joining a union and he arranged a meeting at a restaurant with Robert D. Jackson, a union representative, on April 21. Neal, Matthews and Pennington attended and were given union application forms but, because they did not have the $12.00 membership fee, they arranged to meet with Jackson at 7:30 A.M. on April 22, before they reported to work. The April 22 meeting took place; each of the three paid his membership fee and got a receipt therefor; and membership applications were endorsed by Jackson. Jackson told them to ask Davis and Haynes, the other two shop and warehouse employees, to join the union and that he, Jackson, would see Corrie's president later in the day.

Shortly before 10:00 A.M., while they were on the job, all three, separately,

1. Chauffeurs, Teamsters and Helpers Local No. 175, International Brotherhood of

Teamsters, Chauffeurs, Warehousemen and Helpers of America.

talked to Haynes about joining the union. Haynes said that he would have to talk to his wife first. Neal and Pennington talked to Davis about joining the union, but Davis declined because he was about to leave Corrie's employ. After this conversation with Davis, Matthews observed Davis and the shop foreman, Ernest Casdorph, go toward Corrie's president's office. Casdorph was Davis' supervisor and, in addition, ran a separate business where Davis was also employed.

Neal and Pennington met at the regular coffee break, which began at 10:00 A.M.; Matthews remained in the warehouse. Neal was the first to leave the coffee room, and at about 10:20 A.M. Thomas Corrie handed Neal a check and a discharge notice, telling Neal, "You are paid through the day." Matthews observed what transpired and then Thomas Corrie handed Matthews his check, repeated the remark made to Neal, and told them both, "you may leave when you want to." Pennington was in the coffee room cleaning up, and Thomas Corrie next entered the coffee room and discharged him, saying, "You are paid up through the rest of the day. You may leave now if you want." No explanation was given to any of the three as to why they were discharged. As the men were leaving they met George Corrie and asked him why they had been discharged. He replied, "We felt that your work was not satisfactory."

Relevant to the discharge of the three, as well as the separate § 8(a) (1) violation hereafter discussed, there was evidence that, after lunch on the same day of the discharge, George Corrie asked Haynes whether he had talked to the union officials. About two days later, George Corrie reopened the same subject with Haynes and told him that if "the union got in, it would break him, or something like that * * *."

The Company offered evidence to show that unsatisfactory work, rather than union activity, caused the discharge of the three. Additionally, Thomas Corrie and George Corrie testified that, prior to the discharge, they did not know of the union membership of the three, so that union discrimination was not a motivating factor.

Various faults were attributed to Neal, principally his being in the coffee room with Matthews and thus leaving the warehouse unattended, and overstaying his permitted time in the coffee room, but it appeared that he was given a raise two months before his discharge, had been promised "a lot of overtime" only two weeks before, and had never been disciplined by his supervisor for his alleged objectionable coffee room habits. Although Matthews was claimed to have a lot of faults he, prior to his discharge, was being considered for a salesman's job at Nitro. Thomas Corrie conceded that Matthews was an intelligent fellow who can do something better than warehouse work, and that Thomas Corrie had little personal knowledge of how Matthews performed his job. The Company did not claim fault on the part of Pennington, except that he "had a bottle problem," but it appeared that Pennington had come to work suffering the effects of overindulgence on only one occasion, early in his employment by the Company. Thomas Corrie admitted that Pennington was discharged because he was a good friend of Neal, and "while we were doing it we would just do the whole thing."

The Company stresses Neal's and Matthews' leaving the warehouse unattended during their coffee break and overstaying their coffee break as reasons for their discharge, but the record discloses that, on April 22, the day of the discharge, the warehouse was left in charge of Matthews. The infirmity of this explanation when the effect of the discharge was to remove *that day* three experienced employees from the warehouse, leaving only Haynes, who had been an employee of only three weeks, is manifest.

■ Direct evidence of a purpose to discriminate is rarely obtained, especially as employers acquire some sophistication about the rights of their employees under the Act; but such purpose may be established by circumstantial evidence.

N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368 (1941); N. L. R. B. v. Lexington Chair Company, 361 F.2d 283, 291 (4 Cir. 1966); N. L. R. B. v. Lester Brothers, Incorporated, 337 F.2d 706 (4 Cir. 1964). The discharge of *all* union members (and *only* union members), within hours after they became union members when the Company exhibited awareness of their activities and at a time when the Company was expanding and needed experienced help was sufficient circumstantial proof to support the Board's finding, notwithstanding the Company's denials of an improper motive, especially where any legitimate cause for discharge was not proved.

### Section 8(a) (1) Violation with Regard to Owen Haynes

Owen Haynes had been employed by Company for approximately three weeks preceding the discharge of Neal, Matthews and Pennington. He was one of the shop and warehouse employees sought to be unionized. When approached by Neal and Matthews about joining the union, he did not commit himself to membership. As soon as Neal, Matthews and Pennington were discharged, inquiry was made of Haynes by George Corrie as to whether he had talked to union officials. To this inquiry Haynes, untruthfully, responded negatively, presumably because he understood its full significance. Two days later, when the subject of unionization was again broached by George Corrie, Haynes was told if "the union got in, it would break him [George Corrie], or something like that."

The Board found that Corrie's interrogation of, and statement to, Haynes constituted interference, restraint and coercion in the enjoyment of his rights under the Act. The company contends that the statement was a protected one [2] and, with this contention we would be disposed to agree if only the statement

itself were considered. But, under the circumstances in which the statement was made, we think that there was a sufficient evidentiary basis, upon the record considered as a whole, for the Board to have reached its conclusion.

The difference between permitted and coercive language often lies in an analysis of the "total background of facts and circumstances." Daniel Construction Company v. N. L. R. B., 341 F.2d 805, 812 (4 Cir. 1965), cert. den., 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965). The test is not whether the language or acts were coercive in actual fact, but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate. N. L. R. B. v. Associated Naval Architects, Inc., 355 F.2d 788, 791 (4 Cir. 1966).

Haynes had been exposed to the prompt discharge of his fellow-employees who joined the union but an hour before his employer's first inquiry to him as to whether he had talked to union representatives. The purpose of the question and the significance of an affirmative answer could well be understood to have an adverse effect on his own job security. Indeed, Haynes must have so understood them because he denied talking to union officials. When interrogated two days later and told by his employer that if the union got in, it would "break" him, he could well believe that this statement was more than mere expression of opinion and that the Company would take the even more drastic action of discontinuing its business or extending the number of discharges if the previous illegal discharges did not accomplish their unlawful purpose. Certainly, the record discloses no factual basis to support the accuracy of George Corrie's statement, indeed, the record shows every evidence of the Company's prosperity. We conclude, therefore, that the interrogation and the statement were properly deter-

2. The Company urges, in support of its contention, our decision in N.L.R.B. v. Threads, Incorporated, 308 F.2d 1 (4 Cir. 1962); Salinas Valley Broadcasting Corporation v. N.L.R.B., 334 F.2d 604 (9 Cir. 1964); Texas Industries, Inc. v. N.L.R.B., 336 F.2d 128 (5 Cir. 1964); and Union Carbide Corp. v. N.L.R.B., 310 F.2d 844 (6 Cir. 1962).

mined to be interference, restraint and coercion, violative of § 8(a) (1).

### Section 8(a) (5) Violation

When union organizer Jackson learned of the discharge of Neal, Matthews and Pennington on April 22, Jackson called on George Corrie, accompanied by Jackson's assistant, Willard Thacker. Jackson told George Corrie that three employees in the shop and warehouse had chosen to be represented by the union, whereupon George Corrie immediately replied that he "had fired the three of them."[3] Jackson and George Corrie engaged in a discussion of the matter, and when Jackson pointed out that he had not identified the employees who had joined the union and asked George Corrie how the latter knew which employees Jackson was talking about, George Corrie became angry and the discussion became more heated.

Jackson next advised George Corrie that recognition and bargaining on behalf of the shop and warehouse employees and the reinstatement of the three who were discharged was his mission. George Corrie replied that the employees were discharged for unsatisfactory work, and the union, therefore had no majority, but George Corrie refused to detail the manner in which the discharged employees' work was unsatisfactory. The interview terminated on an inconclusive note, with Jackson stating that he would have no alternative but to file unfair labor practice charges, and Corries responding that "it would have to be that way." Four days later, on April 26, Jackson wrote a letter to George Corrie repeating the request that George Corrie recognize the union and reinstate Neal, Matthews and Pennington, but no reply thereto was ever made.

The Company defends its refusal to bargain on three grounds. They are that: (a) a bargaining unit limited to the Charleston employees was not appropriate, and the only appropriate unit would be one composed of the employees of all three company stores, (b) Casdorph was not a supervisor, hence the bargaining unit consisted of six employees and the union's three authorizations did not give a majority, and (c) the union failed to make a sufficient request to bargain. We find none of these defenses meritorious and conclude that the Company violated § 8(a) (5) by its refusal to bargain.

■ Ordinarily, the Board has broad discretion in selecting an appropriate bargaining unit. Singer Sewing Machine Company v. N. L. R. B., 329 F.2d 200 (4 Cir. 1964); N. L. R. B. v. Quaker City Life Insurance Company, 319 F.2d 690, 693 (4 Cir. 1963); General Instrument Corp. v. N. L. R. B., 319 F.2d 420 (4 Cir. 1963), cert. den., 375 U.S. 966, 84 S. Ct. 484, 11 L.Ed.2d 415 (1964). In many cases there is no "right unit" and the Board is faced with alternative appropriate units. N. L. R. B. v. Quaker City Life Insurance Company, supra.

■ The board found the shop and warehouse employees at the Charleston facility to be an appropriate unit. We cannot say that the record, considered as a whole, fails to support this finding. Each of Company's units maintained a large degree of autonomy in daily operations. The local manager at each facility was the immediate supervisory authority for the employees assigned there. He set their hours and their work was performed subject to his supervision and instruction. He had authority to recommend who should be hired, who should receive pay increases, and who should be discharged.

The Parkersburg facility was 79 miles from Charleston, and Nitro (not yet opened at the time of the events complained of) 13 miles. Each facility maintained a separate bank account and each was charged for any service, money

---

3. According to Jackson, he did not identify the employees by name before George Corrie referred to *"the"* three of them. Thacker corroborated Jackson. Corrie, however, testified to the contrary. The trial examiner and the Board, to whom are entrusted questions of credibility, credited Jackson and Thacker.

or merchandise provided by one to the others. Each bought some material directly from suppliers, maintained time cards for its employees and its own payroll. Employees were not interchanged among Company's stores, and only two employees have ever been transferred from one store to another. No union has sought to bargain in a unit broader than the one sought and found appropriate here, and there has been no history of bargaining in a broader unit.

 Like the determination of what is an appropriate unit, the determination of whether an individual is an "employee" or a "supervisor" within the meaning of the Act is a matter to be determined primarily by the Board in the exercise of its expertise, and if founded on substantial evidence, the Board's determination is final, N. L. R. B. v. E. C. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947); N. L. R. B. v. Hearst Publications, 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). Each determination must depend on its own facts. Northern Virginia Steel Corporation v. N. L. R. B., 300 F.2d 168 (4 Cir. 1962); N. L. R. B. v. Southern Bleachery & Pr. Wks., 257 F.2d 235 (4 Cir. 1958), cert. den., 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959).

■ The record discloses that Casdorph was authorized to direct employees in a manner requiring the use of independent judgment, and Company represented him to the employees as a supervisor. Unlike the discharged employees, Haynes and Davis, Casdorph did not punch a time clock and was not paid by the hour. His duties included scheduling and directing the work of the shop and warehouse employees, including the assignment of overtime, disciplining employees when necessary, effectively recommending hiring and firing, approving wage increases, and reassigning men from shop to warehouse when he considered it necessary. He was introduced to new employees as the "shop foreman" and they were told that they would be "working under" him. The Board's determination that Casdorph was a supervisor was thus amply supported by evidence that he was vested with the powers of management. It follows that the bargaining unit consisted of five employees, and three were a majority.

■ Little need be said in regard to the contention that the union failed to make a sufficient request to bargain. The request was made orally and in writing. It was denied solely because the three union members representing the majority had just been unlawfully discharged. Since their discharge was unlawful, George Corrie's refusal to bargain was a violation of § 8(a) (5). Bilton Insulation, Inc. v. N. L. R. B., 297 F.2d 141 (4 Cir. 1961); Northern Virginia Steel Corporation v. N. L. R. B., supra; Florence Printing Co. v. N. L. R. B., 333 F.2d 289 (4 Cir. 1964).

The order of the Board will be enforced.

Enforcement granted.