**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**P. B. AND S. CHEMICAL COMPANY, Respondent.**

**No. 76–2104.**

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1977.

Decided Dec. 21, 1977.

Woody N. Peterson, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Michael S. Winer and Christine W. Peterson, Attys., N. L. R. B., Washington, D. C., on brief), for petitioner.

W. Bruce Baird, Louisville, Ky. (Matthew R. Westfall, Charles Laurence Woods, III, Middleton, Reutlinger & Baird, Louisville, Ky., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, BUTZNER and HALL, Circuit Judges.

PER CURIAM:

The National Labor Relations Board seeks enforcement of its order of May 24, 1976,[1] adjudging P. B. and S. Chemical Company to be in violation of the Act, 29 U.S.C. §§ 151, 158(a)(1),[2] that is, in discriminatorily discharging employees Jack and Rick Brookover and Raymond Starkey, for exercising protected concerted activities; impermissibly questioning employees about signing union authorization cards; and suspending annual wage reviews and increases until resolution of the pending unionization of employees. The Board directed reinstatement of the three with back pay. The employer confesses fault in the wage suspensions, but cross-petitions for review and vacation of the discharge and interrogation findings.

We enforce that portion of the Board's order on wage reviews and suspensions, which is uncontested; we deny, however, enforcement of the remaining adjudications

---

1. 224 NLRB No. 1 (May 24, 1976).

2. The section reads:
  "(a) It shall be an unfair labor practice for an employer—
  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"
  Section 157 states:
  "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

because, on the record as a whole, the order lacks substantial supporting evidence.

The Company, a Kentucky corporation, operates a facility at Proctor, West Virginia for the preparation and distribution of chlorine gas cylinders. There it has ten production employees, a salesman and a secretary. Ralph Harpley was plant manager from 1970 until November, 1974. Arlene Dunn was promoted June 11, 1974 to District Manager in charge of this plant. Harpley reported to her in McKeesport, Pennsylvania, and agreed to keep her apprised of sales, customer and personnel problems.

In the spring of 1974, Harpley, a personal friend of the Brookovers' parents, hired these brothers and their friend Raymond Starkey as production employees. Testimony of management and employees revealed that these three engaged in egregious and disruptive horseplay on the job. They sprayed co-workers with water and paint, threw lead washers and metal cylinder caps at others, threatened fights with their supervisor, insulted the lady district manager, bored holes in the wall of the ladies' washrooms, took unauthorized breaks from work and left their jobs unduly early. Substantial evidence cannot be found in the record to justify the rejection of the employer's accusations against these three employees.

Despite Plant Manager Harpley's promise to inform District Manager Dunn of employee problems, he did not do so until November 1 when he called her to say he was quitting, because "I just can't handle these people any more". Harpley later said he did not release the Brookovers or Starkey, despite constant complaints from their foreman, only because of his friendship with the senior Brookovers.

Following Harpley's call, Dunn went to the plant, investigated the discipline there and the next day, November 5, conferred with Harpley. Her inquiries on this trip of the foreman, deputy foreman, sales representative and several other employees disclosed multiple infractions by the Brookovers and Starkey. She agreed with Harpley's recommendation to discharge the Brookovers and Starkey, but before doing

so she wrote out the bases of her decision. This memorandum follows:

"Reasons for dismissal.
1. Slow down on job. Failure to complete job assignment on time.
2. No respect for supervisors.
3. Abused company equipment.
4. Taking unauthorized breaks, or taking longer time than permitted.
5. Cause dissension among co-workers.
6. Misconduct on job.
7. Threaten bodily harm to Supervisor and fellow employees."

After reading this enumeration to the Brookovers and Starkey, Dunn informed them of their disemployment. Immediately afterward she assembled all the other employees, explained the dismissals and welcomed any questions they might have. She then noted in writing seven instances of dischargees' misconduct, and read it to the employees at their afternoon rest period, after which all employees present voluntarily subscribed the paper in verification. This was the list of the improprieties and derelictions:

"The following events occurred on the approximate dates and were witnessed by the signers below:
1. July, 1974, Demanded a break at 8 A.M. when they were refused and told if they took it at 8 A.M. they would not get one at 10 A.M. the Brookover brothers walked off the job, they were permitted to returned [sic] to work.
2. August or September, 1974, Decided to quit at 4 P.M. and refused to return to work.
3. September, 1974, Threw washers and other cylinder parts around the plant, when Joe Ebert told Supervisor Ankrom, Ebert was threatened with bodily harm.
4. September 18, 1974, Put axle grease on doorknob.
5. September 18, 1974, Knocked or cut hole in ladies room wall, when patched, they repeatedly knocked it open again. Hole put in ladies room ceiling.
6. September 19, 1974, when told to speed up on cylinders, Jack Brookover

said he was doing as much as everyone else and invited Ankrom outside to fight. 7. October, 1974, Starkey dismissed for not properly cleaning warehouse floor prior to painting. He had been shown how twice and Ralph Harpley worked with him for over ½ hour to demonstrate. He refused to do properly. When he was dismissed, Ralph took him home, when Ralph returned to plant Brookovers had walked off with others and did not return to work until Starkey was permitted to come back."

The employees who signed this statement testified to its correctness, and thus it was put in evidence as proof of the misdoings laid by the employer to the three relieved of their jobs.

The Administrative Law Judge in an August 13, 1975 decision, found that Jack and Rick Brookover and Raymond Starkey were fired for just cause. The NLRB reversed, May 24, 1976, on the ground that the discharges were triggered in part by their participation in two "protected walkouts" and, therefore, had violated § 8(a)(1). We cannot agree.

The first such incident occurred in August 1974 when the Brookovers demanded an earlier morning break since they had begun work an hour early. This was granted, but they were told by the foreman that they could not also have a second break at the usual time. Rick argued with Harpley about the second break, and when Harpley stood firm, Rick Brookover walked off and left the plant, accompanied by his brother, Steve, who by then was in the Company's employ. They returned the next day and were re-accepted.

The second allegedly protected walkout occurred in October 1974 when Starkey refused to finish cleaning the warehouse floor. Harpley, who worked on his hands and knees alongside Starkey for some time, told him that if he did not complete the job, his employment was at an end. Starkey, saying he would quit the job rather than work "like a woman" left the plant, first informing the other Brookovers of his decision. In protest, other employees walked off, refusing to return unless Starkey was rehired. When Harpley acceded to this demand, they resumed work.

The Board concluded that on both occasions the employees walked out in protest over complaints about working conditions and did not intend to abandon their jobs. Without passing on the reasonableness of the workers' determinations, the Board found ". . . that the walkout constituted protected concerted activity which, if shown to be a cause in the discharges here, requires a finding that Respondent's action violated Section 8(a)(1) of the Act."

■ To start with, the conduct was not protected. The Administrative Law Judge found, and there is no substantial proof to the contrary, that on the days in question, the Brookovers and Starkey voluntarily severed their employment. This is not protected concerted activity under §§ 8(a)(1) and 7 of the Act, 29 U.S.C. 158(a)(1) and 157; *NLRB v. Jamestown Veneer & Plywood Corp.,* 194 F.2d 192, 194 (2 Cir. 1952); see *NLRB v. Southern Materials Co.,* 345 F.2d 240, 242–243 (4 Cir. 1965).

■ The Board ultimately bottomed its decision on the finding that the employer discriminated against the three disrupters. This conclusion is drawn from these premises: that before their employment there was constant horseplay by the plant employees; that the trio contributed no more to the disorder than did the others; but the three were discharged for their participation, while the others were not, and, hence, the employer discriminated against the Brookovers and Starkey. The evidence does not bear out this syllogism.

The witnesses called by the Board's General Counsel stated that before the three dischargees arrived, horseplay was infrequent and never disruptive of work in the plant. However, the witnesses made clear that immediately after the entry of the Brookovers and Starkey they began and continually maintained a rowdiness annoying to their co-employees and a hindrance to their efforts. The buffoonery introduced by the three increased "dramatically" dur-

ing their stay, so much so that it interfered with on-the-job production. Obviously there was no discrimination in firing the three without firing the other employees too.

 Nor do we agree with the Board that Dunn's questioning of employees violated § 8(a)(1) of the Act, 29 U.S.C. 158(a)(1). An employee, Ebert, reported to Foreman Ankrom that Jack Brookover, recently discharged, with three others had blocked his way while riding his motorcycle en route home and coerced him into signing a union authorization card. He asked to speak to Dunn about it. After talking to him, Dunn asked employees individually if and under what circumstances they had signed union cards. She told them their responses should be voluntary and a refusal would not jeopardize their jobs. They spoke freely with her and indicated that several others had been coerced into signing cards by the Brookovers. In this her statements were not controverted.

The Administrative Law Judge, finding Dunn's motive proper and the questioning not inherently coercive, dismissed the allegation that her inquiry offended the Act. The Board disagreed, for in its view Dunn, regardless of her motive, exceeded the scope of permissible interrogation thereby transgressing the Act.

 The gravamen of the violation is intimidation tending to discourage union activities. As was stated in *Corrie Corp. v. NLRB*, 375 F.2d 149, 153 (4 Cir. 1967):

"The difference between permitted and coercive language often lies in an analysis of the 'total background of facts and circumstances'. (Citation omitted.) The test is not whether the language or acts were coercive in actual fact, but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate."

Applying this standard to the conduct in question, we cannot accept the Board's conclusion that Dunn's questioning had a tendency to intimidate.

In summary, the proof is so overwhelming, contrary to the Board's findings, that the three discharges in suit were for good cause that we do not hesitate to refuse enforcement of its disputed orders. *Firestone Tire & Rubber Co. v. NLRB*, 539 F.2d 1335, 1337 (4 Cir. 1976); *Torrington Company v. NLRB*, 506 F.2d 1042, 1047 (4 Cir. 1974).

ORDER ENFORCED IN PART: DENIED IN PART.