**STANDARD–COOSA–THATCHER CARPET YARN DIVISION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC, Intervenor.**

**No. 81–1673.**

United States Court of Appeals, Fourth Circuit.

Argued March 30, 1982.

Decided Sept. 20, 1982.

Rehearing and Rehearing En Banc Denied Dec. 23, 1982.

Homer L. Deakins, Jr., Greenville, S. C. (Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, S. C., on brief), for petitioner.

Richard Michael Fischl, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Barbara Jane Carey, Asst. Gen. Counsel, New York City (Arthur M. Goldberg, Gen. Counsel, George A. Kirschenbaum, Associate Gen. Counsel, New York City, on brief), for intervenor Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC.

Before WINTER, Chief Judge, BRYAN, Senior Circuit Judge, and HALL, Circuit Judge.

HARRISON L. WINTER, Chief Judge:

In February 1979, the Amalgamated Clothing and Textile Workers Union (the Union) began a campaign to organize a plant of the Standard-Coosa-Thatcher Carpet Yarn Division, Inc. (the Company) in Boaz, Alabama.[1] The Union had lost a previous election in the plant in December 1977. By March 21, 1979, however, eighty-seven of the 147 bargaining-unit employees had signed cards designating the Union as their exclusive bargaining representative. The Union therefore filed a petition for a representation election and made a bargaining demand on the Company, which was refused. The Board conducted an election on May 18, 1979, and the Union lost by a vote of 67 to 74.

On July 29, 1981, the Board adopted, as modified, an administrative law judge's determination that the Company committed various unfair labor practices in connection with the 1979 campaign. The Board's order not only required the Company to cease and desist from such practices and to reinstate a discharged employee, but also directed the Company to bargain with the Union upon request. The Company petitions for review of the Board's order, and the Board cross-petitions for enforcement. We grant enforcement.

I.

The Board found numerous violations of § 8(a)(1) of the National Labor Relations Act as amended (NLRA), 29 U.S.C. § 158(a)(1) (1976). For purposes of this discussion, the asserted violations will be grouped according to the Company personnel involved.

1. Jurisdiction is invoked under 29 U.S.C. § 160(f) (1976) on the grounds that the Company transacts business within this circuit.

### A. Statements by Plant Manager Bowman

■ On the morning of the election, employee Kathy Holland engaged plant manager Jack Bowman in a conversation about unionization. Holland volunteered that she had read the Company's contract covering unionized employees at another plant and found nothing in its terms of benefit to employees. Bowman responded that that contract was the first thing the Company's lawyers would insist on if the Union won the election.

The Board found that Bowman's response was a threat that the Company would not bargain in good faith if the Union were victorious. Noting that the conversation took place just hours before the voting, the Board concluded that Bowman's threat of insistence on contractual terms he knew Holland found unpalatable coerced Holland in the exercise of rights guaranteed by § 7 of the NLRA, including the right to exercise the franchise free of intimidation.

The Company insists that this finding puts the Board in the impermissible posture of judging contractual terms. The argument is unpersuasive, however, for the Board focused, not on particular contractual terms, but rather on the possible effect of Bowman's statement. We have previously held that such statements as "a union would do employees no good" may be unlawfully coercive in some circumstances. *N. L. R. B. v. McCormick Concrete Co.,* 371 F.2d 149, 152 (4 Cir. 1967). Here, the fact that the statement was made on the brink of the election to one who saw no benefit in the contract is substantial evidence supporting a finding of coercion. *See Procter & Gamble Manufacturing Co. v. N. L. R. B.,* 658 F.2d 968, 984 (4 Cir. 1981); *Wyman-Gordon Co. v. N. L. R. B.,* 654 F.2d 134, 145–46 (1 Cir. 1981); *Daniel Construction*

*Co. v. N. L. R. B.,* 341 F.2d 805, 811 (4 Cir.) (whether an employer's remarks are coercive "is a question essentially for the specialized experience of the NLRB"), *cert. denied,* 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965).

### B. Statement by Personnel Manager Bouldin

■ In mid-February,[2] employee Patricia Whisenant remarked to personnel manager Ernest Bouldin that employee Holland was engaged in "Union business." According to Whisenant's testimony, which was credited by the administrative law judge, Bouldin replied that if Holland "don't watch it she's going to get her ass fired."

The Board properly concluded that this threat of discharge for union activity was coercive. *See, e.g., N. L. R. B. v. Aerovox Corp.,* 435 F.2d 1208, 1210 (4 Cir. 1970). The Company's sole objection is that this violation was not alleged in the complaint. At the administrative hearing, however, the General Counsel moved to amend the complaint, and the motion was granted.

In mid-March, Bouldin advised Whisenant that she would not be given a job she had applied for. Whisenant lost her composure and told Bouldin, "You just hate me." Bouldin answered that he would like her a lot better if she were on the right side.

The Board characterized Bouldin's reply as an invitation to abandon the Union in order to obtain the benefits of an improved relationship with management and held that it violated § 8(a)(1).[3] The Company argues that there is no substantial evidence of coercion since it was known to Whisenant that, under established procedures, the job in question would go to the most senior applicant. Bouldin's remark, however, can

---

2. Unless otherwise indicated, all dates refer to the year 1979.

3. The General Counsel alleged that Bouldin threatened Whisenant with a loss of benefits, whereas the Board found that he enticed her with a vague promise of benefits. On either view, the benefits were contingent upon her opposing the Union. The Company's argument

that the finding varied fatally from the complaint is without merit, since the Company had ample notice that a § 8(a)(1) violation was alleged as to the particular conversation at issue and the matter was fully litigated by the parties. *See N. L. R. B. v. Klaue,* 523 F.2d 410, 414–15 (9 Cir. 1975); *N. L. R. B. v. Tamper, Inc.,* 522 F.2d 781, 790 (4 Cir. 1975).

be fairly understood as implying that management would confer advantages on anti-union employees. Coming from the senior personnel officer at the plant, such a comment can reasonably be deemed coercive.

On the day before the election, Whisenant went up to Bouldin and told him she was sorry to be working against him in the campaign but that she "would be on the gates [for the Union] the next morning." Bouldin asked, "Pat, what has this company done to you? What have you got against this company?" Whisenant answered, "Nothing." Bouldin persisted, asking Whisenant again why she was working for the Union. She responded, "[I]t was something I believed in." The Board concluded that Bouldin engaged in "coercive interrogation" by "probing into Whisenant's motives for supporting the Union."

■ Employers are free to ask employees about their sentiments regarding a union provided the questioning is not coercive. The test of coerciveness " 'is not whether the language or acts were coercive in actual fact, but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate.' " *N. L. R. B. v. P. B. & S. Chemical Co.*, 567 F.2d 1263, 1267 (4 Cir. 1977) (quoting *Corrie Corp. v. N. L. R. B.*, 375 F.2d 149, 153 (4 Cir. 1967)). Here, the fact that Whisenant initiated the conversation, unhesitatingly volunteered her pro-union sentiment, and stuck by her position under questioning militates against the finding of coerciveness. But Bouldin's senior position, his repeated questions, and the fact that he was speaking on the eve of the election reasonably support the Board's determination. Because the Board's finding is supported by substantial evidence, it must be sustained.

4. Dennis Williams had been discharged about a week before this exchange transpired. As discussed later, the Board found that Williams was fired in retaliation for his support of the Union.

5. The Company argues that this finding violates due process because the complaint alleged retaliation for union activities rather than for

### C. *Statements by Supervisor Lowery.*

■ On May 12, employee Betty Underwood (a Union activist) and other employees protested to plant manager Bowman that their paychecks for the night shift were too low by $2.00. Bowman explained that there had been a computer error and promised to rectify the matter. Supervisor Frank Lowery later approached Underwood at her work station and inquired about the problem. Underwood asserted that the Company had deliberately shortchanged the night-shift employees. According to Underwood's credited testimony, the following conversation ensued:

Frank said, just raise hell, Betty, said if you'll notice Dennis Williams raised hell for a couple of weeks, and he's not here any longer.[4]

And I said, Frank, if that's a threat, I won't be as easy to get rid of as Dennis was. And he said if you'll notice this is a one-on-one conversation, and I'll keep it that way. My word's as good as yours, and I told him we'd let the government decide whose word was best.

■ The Board found that Lowery threatened Underwood with discharge for engaging in protected concerted activity.[5] The Company maintains that Underwood was not participating in concerted activity when she spoke with Lowery and that her accusation that the Company had cheated night-shift employees was patently false and therefore not protected. These contentions are unpersuasive. Lowery's statement was a thinly veiled warning that further activities like Underwood's protest to management would result in her dismissal. That protest was clearly concerted activity; the truth or falsity of Underwood's views does not deprive such activity of its protection.

protected concerted activities. This argument is frivolous. The Company had fair notice of the episode alleged to be coercive, and the matter was fully litigated. *See generally* note 3 *supra.* Whether the concerted activity which provoked the threat was related or unrelated to the Union has no bearing on whether there was a § 8(a)(1) violation.

On March 5, Lowery issued Underwood a verbal warning for dropping "hard waste" on the plant floor in violation of Company rules. According to Underwood, Lowery

> told me that he wanted to break me from a bad habit while the Union was in town. He said that he knew I was in a Union campaign, and that at this time I'd do nothing to break a rule. And so he was going to break me from a bad habit while they were in town.

Crediting Underwood's testimony, the Board found that Lowery's warning to Underwood was "an implied threat ... of reprisals for union activity."

If the Board had found that the disciplinary warning issued to Underwood was discriminatory and hence violated § 8(a)(3), we would probably be constrained to set it aside. An employer who disciplines an employee for violation of a valid rule commits no § 8(a)(3) violation absent a showing that the discipline was in fact motivated by a desire to penalize union activity. The charge made here, though, is not that the discipline imposed was discriminatory and proscribed by § 8(a)(3), but rather that the specific form of the warning was coercive in violation of § 8(a)(1). We therefore have no occasion to inquire whether the ostensible reason for its issuance was actually a pretext.[6] Instead, we need only decide whether the words by which the warning was conveyed could be found to have tended to coerce an employee in the exercise of her § 7 rights.

In answering that question, we are hindered, as was the administrative law judge, by inconsistent evidence concerning the words Lowery employed in giving the warning. Lowery's testimony of the pertinent conversation included no reference to union activities. In weighing Lowery's testimony against Underwood's, the administrative law judge was frank to admit that demeanor evidence supplied no clue as to which witness's version of events was closer to the truth. He credited Underwood's testimony, however, partly on the ground that she made herself vulnerable by testifying while still under Lowery's supervision. We reject this reasoning, for the mere fact that an employee exposes himself to retaliation by testifying against his employer has little bearing on credibility. *L. S. Ayres & Co. v. N. L. R. B.,* 551 F.2d 586, 588 (4 Cir. 1977). Nevertheless, the record adequately supports the administrative law judge's credibility determination. Lowery took the stand but never denied having mentioned the Union in his warning to Underwood. His silence on this question, in the face of Underwood's specific allegation, fairly gives rise to an adverse inference.

Accepting the administrative law judge's findings of fact, we unhesitatingly affirm his conclusion that Lowery's warning to Underwood violated § 8(a)(1). In the version credited by the administrative law judge, Lowery's warning had a clear tendency to coerce by implying that the Union's presence in the plant would lead to unusually strict enforcement of the rules. Discipline which would otherwise be valid becomes an unfair labor practice under § 8(a)(1) when accompanied by statements tending to intimidate union activities unrelated to any disciplinary infraction.

Employee Elizabeth Sharp testified that Lowery engaged her in the following conversation on an unspecified date in May:

> Mr. Lowery ... walked on my job and said, Liz, says I know you're friends with Betty Underwood, but said I think you're on my side. I said, Frank, I don't know what you're talking about. He said, Liz, you know what I'm talking about and said I still think you are on my side.
>
> I said, Frank, what are you talking about? and he turned around and walked off.

The Board found that Lowery subjected Sharp to unlawful interrogation. Noting that Underwood was a prominent supporter of the Union and that Lowery's comments were provoked by no apparent good reason,

---

6. Other charges in this case do raise the issue of discriminatory and pretextual discipline. They are treated in Section II *infra.*

the Board characterized his "enigmatic statement" as "an effort to elicit a statement from Sharp as to whether she was for or against the Union."

The Company argues that no reasonable inference of coercion can be drawn from Lowery's exchange with Sharp. Indeed, Lowery's relatively junior position and his apparent lack of success in eliciting information weigh against a finding of coercion. But the obliqueness of Lowery's approach can reasonably be deemed to have a tendency to intimidate. Such a tendency is heightened by the fact that the approach was in the midst of an acrimonious campaign, just a few weeks before the representation election. *See generally Excavation-Construction, Inc. v. N. L. R. B.,* 660 F.2d 1015, 1022 (4 Cir. 1981). Given the absence of any apparent legitimate reason for Lowery's conduct, the Board's conclusion should stand.

On February 25, Lowery called employee Melinda Kennedy to his office and asked whether she had signed a union card and, if so, whether she knew what it meant. In the ensuing conversation, Lowery volunteered that "if the Union did come in . . . we would not get paid any more than what we were getting paid now because the Company would only pay so much." On the basis of these facts, the Board found not only coercive interrogation but also interference with § 7 rights by means of a representation of Company intransigence on the matter of wages.

That Lowery questioned Kennedy in his office, rather than at her workplace, may suggest coerciveness. *See, id.; N. L. R. B. v. Lexington Chair Co.,* 361 F.2d 283, 289 (4 Cir. 1966). Cutting in the opposite direction is the fact that Kennedy displayed little reluctance to discuss the pros and cons of unionization with Lowery. It is the tendency of Lowery's conduct, however, rather than its actual effect, which is dispositive. *See N. L. R. B. v. P. B. & S. Chemical Co.,* 567 F.2d at 1267. The Board's findings respecting interrogation and threatened intransigence are not unreasonable and should therefore be accepted.

On March 17, employee Rebecca Stephenson asked Lowery for permission to take some time off from work. Lowery said he would grant the request since he knew she had not signed a union card. Not wishing to be compromised, Stephenson told him she had indeed signed a card. Lowery responded that she could take time off whether or not she had signed a card.

The Board concluded that Lowery's comments were intended to elicit information about Stephenson's attitude toward the Union and were therefore an indirect form of prohibited interrogation. The Board further found, however, that any threat of reprisal or promise of benefit implicit in his comments was dispelled by his subsequent promise to disregard Stephenson's union sympathies in considering her request for leave.

These findings seem flatly inconsistent with one another. Interrogation violates § 8(a)(1) only if it tends to coerce. *See N. L. R. B. v. P. B. & S. Chemical Co.,* 567 F.2d at 1267. Here the Board specifically found that Lowery immediately dispelled any threatening aspect of his statement. Furthermore, that finding rejected on the merits the General Counsel's sole allegation concerning the Lowery's Stephenson conversation—namely, that it constituted an unlawful threat of reprisal. The General Counsel specifically disavowed an interrogation theory at the hearing, and the Board was not entitled to charge a violation that was not pressed upon it by the complaining party. *See N. L. R. B. v. Tamper, Inc.,* 522 F.2d 781, 789–90 (4 Cir. 1975); *see also* note 3 *supra.* It follows that this finding must be set aside.

D. *Statements by Supervisor Harris*

On February 13, supervisor Bennie Harris took Kathy Holland from her work station to the nurse's office, locked the door, and asked Holland why she wanted a union. When she responded that a union would protect workers' seniority rights, Harris countered that "we'll all be out of a job if you get this Union . . . [since the Company]

will close down Boaz and use it for a warehouse." When Holland disputed the point, Harris insisted that he had "seen it in black and white, and I'm concerned with my job—with losing my job, too."

■ ·The Board found that Harris engaged in coercive threats and interrogation. Although the Company argues that Holland was not personally intimidated, such questioning behind locked doors and of predictions of plant closure by a supervisor who claims to be reliably informed have an obvious tendency to coerce.

In mid-February, Harris called Patricia Whisenant into his office, locked the door, and asked her why she had signed a union card. Harris told Whisenant that, if the Union won the election, she could no longer deal with management in person but would have to speak through a Union steward. He also stated that the Company would close the plant if the employees voted the Union in.

The Board found that Harris interrogated Whisenant and threatened her with plant closure and loss of access to management, all in violation of § 8(a)(1).[7] The Company argues that the conduct in question was not coercive, since management was free to point out the recognized fact that unionized employees ordinarily deal with their employers indirectly through union representatives. *See N. L. R. B. v. Sacramento Clinical Laboratory, Inc.,* 623 F.2d 110, 112 (9 Cir. 1980). Even truthful comments by a supervisor, however, may be impermissible in circumstances tending coercively to discourage unionization. *See id.* That Harris's interview with Lowery was coercive sufficiently appears from the fact that it was conducted surreptitiously in a locked room.

On the day after the election, Harris walked up to Whisenant and asked, "Pat, where is your god-damn Union[?]" To her comment that the Union would challenge the election in court, Harris replied: "[Y]ou're not satisfied getting in as deep as you have. You just go on and get in deeper and deeper." The Board reasonably concluded—and the Company apparently does not contest—that Harris violated § 8(a)(1) by "statements clearly calculated to make Whisenant fearful of [the Company's] reaction to her protected union activities."

### E. *Interview by Attorney Perrin*

In January 1980, Company counsel, Martha C. Perrin, questioned approximately seventy employees about their union cards. The information thereby gleaned was to be used in the administrative hearing on the Union's unfair-labor-practice charges. The interviews took place in private in the first-aid room of the plant. Perrin's usual practice was to introduce herself as a Company attorney who, in preparation for a hearing, wished to speak to the employee regarding his authorization card. She conveyed this information by reading a prepared statement which made clear that the employee could refuse to cooperate and would face no reprisals.

The administrative law judge found that Perrin failed to read the prepared statement or recite the usual safeguards when she interviewed employee Willis Langston. Upon questioning, Langston readily stated that he had signed a card and understood its contents.

By omitting assurances against reprisals, Perrin failed to comply fully with the safeguards required by *Johnnie's Poultry Co.,* 146 N.L.R.B. 770 (1964), *enforcement denied,* 344 F.2d 617 (8 Cir. 1965).[8] The ad-

---

**7.** The Company insists that the Board erred in finding interrogation as well as threats, since the General Counsel alleged only threats. Clearly, though, the Company had adequate notice that a § 8(a)(1) violation was alleged as to the particular conversation at issue. With respect to this episode, the general counsel did not disavow an interrogation theory at the

hearing. On the contrary, the issue was fully litigated by the parties. *See* note 3 *supra.*

**8.** The Board in *Johnnie's Poultry* held:

In allowing an employer the privilege of ascertaining the necessary facts from employees in [preparation for litigation], the Board and courts have established specific safeguards designed to minimize the coercive

ministrative law judge noted that Perrin failed to recite the assurances only once in more than seventy interviews, and he considered it a fair inference that Langston had previous knowledge of the policy against reprisals based on conversations with other employees whom Perrin had interviewed. Finding the "coercive impact" of the Langston interview to be slight at most, the administrative law judge ruled that Perrin's inadvertent deviation from the *Johnnie's Poultry* standards did not constitute an unfair labor practice.

The Board rejected the administrative law judge's conclusion. It held instead:

Compliance with *Johnnie's Poultry* safeguards is the minimum required to dispel the potential for coercion in circumstances where an employee is interrogated concerning his intended testimony before the Board. The effect of the Administrative Law Judge's decision here is to substitute a different standard.

The Board, in effect, ruled that failure to observe the *Johnnie's Poultry* standards is a per se violation of § 8(a)(1). Arguably, the statute would be better served by raising a rebuttable presumption of coerciveness in such cases—a presumption which the Company rebutted to the satisfaction of the administrative law judge in this case. Here, too, though, it is the tendency of an employers' words and conduct, rather than their actual impact, which is controlling. The Board's per se rule simply recognizes that a significant risk of coerciveness arises when an employer questions employees about a union without informing them that they may, with impunity, decline to respond. The requirements of *Johnnie's Poultry* are reasonably calculated to limit that risk and do not unreasonably restrict an employer's interest in gathering information for use in Board hearings. Because

the Board's rule is consistent with the governing legal standard and does not constitute an abuse of discretion, we have no grounds to set aside findings derived from applying it.

## II.

We turn now to alleged violations of § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3) (1976).

### A. Discriminatory Enforcement of Plant Regulations

The Board held that the Company violated § 8(a)(3) by enforcing a plant rule in a manner calculated to discourage Union activities among its employees. The rule in question prohibits employees from leaving their work areas or the plant without authorization.

We have long held that an employer's enforcement of a valid disciplinary rule does not constitute an unfair labor practice absent an " 'affirmative and persuasive' " showing that enforcement was motivated by a desire to discourage union activity rather than by supportable cause. *Firestone Tire & Rubber Co. v. N. L. R. B.,* 539 F.2d 1335, 1337 (4 Cir. 1976) (quoting *N. L. R. B. v. Billen Shoe Co.,* 397 F.2d 801, 803 (1 Cir. 1968); *see N. L. R. B. v. Appletree Chevrolet, Inc.,* 608 F.2d 988, 993 (4 Cir. 1979). Where the evidence suggests both proper and improper motives for a challenged disciplinary action, we have given the employer the benefit of a presumption so as to prevent pro-union employees from insulating themselves from discipline for cause. *See, e.g., Procter & Gamble Manufacturing Co. v. N. L. R. B.,* 658 F.2d 968, 980 (4 Cir. 1981); *N. L. R. B. v. Burns Motor Freight, Inc.,* 635 F.2d 312, 314 (4 Cir.

impact of such employer interrogation. Thus, the employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; the questioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature; and the questions must not exceed the neces-

sities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee's subjective state of mind, or otherwise interfering with the statutory rights of employees. When an employer transgresses the boundaries of these safeguards, he loses the benefits of the privilege. 146 N.L.R.B. at 775 (footnote omitted).

1980) (per curiam). But the General Counsel may, of course, rebut that presumption by showing that discipline would not have been applied, or would have been less stringent, in the absence of union activities. *See American Thread Co. v. N. L. R. B.,* 631 F.2d 316, 320–23 (4 Cir. 1980).

The evidence in this case indicates that, during the Union's initial campaign in 1977, plant manager Bowman told employee Donna McWhorter that the Company was attempting to stop Union activists from roaming around to collect employee signatures, and that it therefore looked bad to permit opponents of the Union to move freely about the plant. In March 1979, supervisor Harris issued Union activist Patricia Whisenant a warning against leaving the department. Although Whisenant had committed no violation, Harris indicated he wished to prevent her from later claiming she had not been warned. In February and March 1979, supervisor King told two employees that they could no longer leave the department without permission. The employees testified that they had previously been free to leave the department without permission and without fear of discipline. Dennis Williams received written warnings for unauthorized absences in March and April 1979, and Gloria Stanfield received a warning in May 1979.

The administrative law judge, whose findings were adopted by the Board, weighed the evidence as follows:

> Between November 1977, 1 month before a Board-conducted election, and February 9, 1979, the date the present union campaign began, the only proven warnings given for infractions of the rule were [issued on] December 11, 1978 and February 2, 1979. It is highly improbable that all 147 employees religiously abided by the rule during this 13-month period, and there is credible employee testimony that they did not. Bill King's advice to Bobby Joe King that they could no longer leave without permission signaled a change to

more rigid enforcement, and Harris' prospective warning to Whisenant emphasized a new insistence on strict compliance with the rule. No persuasive reason was proffered for this more stringent policing of rule violations, and the reasons for the 1977 enforcement stated by Bowman to McWhorter, combined with the timing of the statements of Bill King and Harris shortly after the commencement of the new campaign, leads me to the conclusion that the emphasis on enforcement after the campaign started was prompted by the new campaign and was designed, as in 1977, to impede the acquisition of signed authorization cards.

In our view, the record amply and persuasively supports the Board's conclusion that the Company enforced the unauthorized-absence rule more intensively during the Union campaigns than at other times, and that it did so for the purpose of impeding unionization. The Company notes that two employees received warnings for unauthorized absences during the interval between the two campaigns. This scarcely undermines the evidentiary basis of the Board's finding, however, since those two warnings were for leaving the plant, not merely the assigned work areas within the plant. Hence, they do not cast doubt on the testimony indicating that employees were usually free—except during Union campaigns—to move among the various departments within the plant. Furthermore, isolated enforcement between Union campaigns is not inconsistent with intensified enforcement during the campaigns. Nor is it fatal to the Board's finding that the rule was enforced equally against pro- and anti-union employees during the campaign. As the Board emphasized, blanket enforcement would have been the most effective means of hampering the Union's card campaign.

In sum, the Board's conclusion that the unauthorized absence rule would not have been rigorously enforced but for union activities is soundly based on the evidence.[9]

---

**9.** This conclusion obtains whether the ultimate burden of proof is placed on the General Counsel or instead on the Company. We therefore find it unnecessary to accept or reject the test adopted by the Board in *Wright Line,* 251 N.L. R.B. 1083 (1980), *enf'd,* 662 F.2d 899 (1 Cir.

It follows that the Company violated § 8(a)(3) by using an otherwise valid rule as a weapon for discouraging unionization. *See American Thread Co. v. N. L. R. B.,* 631 F.2d at 320, *cf. N. L. R. B. v. Roney Plaza Apartments,* 597 F.2d 1046, 1049 (5 Cir. 1979) (a tightened enforcement policy is invalid if imposed with discriminatory intent).

B. *The Discharge of Dennis Williams*

Dennis Williams received warnings for leaving his work place and going to other parts of the plant on March 29 and April 9, 1979. On April 25, he received a warning for being outside the mill without permission, leaving trash at his work place, failing to clean his machine, and failing for two days to punch his timecard. On May 7, Williams was again warned for failure to punch his timecard. He was then dismissed pursuant to the Company's usual policy of terminating employees who receive four warnings.

The Board found that the Company had "strain[ed] to terminate Williams" because of his support of the Union. The Board held, in particular, that the first two warnings violated § 8(a)(3) since they reflected the anti-union policy behind strict enforcement of the unauthorized-absence rule. As to the third warning, involving the incident in which Williams was caught outside the plant during his shift, the Board found that the Company had treated Williams more harshly than a nonunion employee who was caught with him but received no warning. The Board concluded: "The General Counsel has set forth a *prima facie* case, which [the Company] has not convincingly rebutted, that the entire sequence of warnings was consciously designed to remove a union adherent from the payroll."

The Company raises several arguments against the Board's conclusion. First, it attacks the assumption that enforcement of the unauthorized absence rule was invalid.

1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), whereby the burden of proof shifts to the employer once the General Counsel makes out a prima facie case.

Since we have ruled against the Company on this point in Section IIA above, there is no reason to review it here. Second, the Company contends there is no evidence that it had knowledge of Williams's pro-union sentiments when it issued the first two warnings. As the Board found, however, the Company had reason to infer Williams's sympathies at least as early as the date of the second warning, when Lowery observed Williams conversing with Union activist Underwood. Even absent such knowledge, moreover, enforcement of the unauthorized-absence rule was unlawful if intended to discourage unionization. *See Dillingham Marine & Manufacturing Co. v. N. L. R. B.,* 610 F.2d 319, 321 (5 Cir. 1980). Finally, the Company argues that there is no substantial evidence of discriminatory enforcement with respect to Williams's third warning. Both Williams's credited testimony and the documentary evidence of the warning, however, fully support the Board's finding that the Company discriminated impermissibly when it punished Williams but not his co-offender. *See American Thread Co. v. N. L. R. B.,* 631 F.2d at 322.

Thus, the General Counsel made a persuasive showing that Williams would not have been discharged but for the Company's desire to forestall unionization. Under Company policy, it takes four warnings to justify a discharge. Because three of Williams's warnings were based on an anti-union enforcement policy regarding the unauthorized absence rule, his discharge clearly violated § 8(a)(3).[10]

C. *The Bargaining Order*

We come now to the final issue in the case: whether the Board erred in ruling that the Company violated § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5) (1976), and in ordering the Company to recognize and bargain with the Union, even though the Union has yet to win a representation election in the relevant bargaining unit.

10. Here, too, the General Counsel's showing is sufficiently strong that we need not decide whether the ultimate burden of proof shifted to the Company. *See* note 9 *supra.*

It seems clear that the Company's unfair labor practices were not so persuasive and outrageous that a bargaining order would be justified even absent a showing that the Union achieved a card majority. Rather, the question is whether the employees, having given the Union a card majority during the campaign, have been deprived of a fair election and of a reasonable likelihood that a fair election could be held in the future. As the Court observed in *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969):

> If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Id.* at 614–15, 89 S.Ct. at 1940.

The Company raises essentially two arguments against the appropriateness of a *Gissel* bargaining order: first, that the Board failed to make sufficiently detailed findings concerning the impact of the Company's unfair labor practices on the election process; and second, that the evidence does not indicate that a fair election cannot now be held.

■ The Board's inconsistency in granting or withholding bargaining orders in apparently similar cases has caused concern among the courts of appeals, which have admonished the Board to articulate more precisely the controlling standards and factual distinctions. *See., e.g., N. L. R. B. v. Jamaica Towing, Inc.,* 632 F.2d 208, 215 (2 Cir. 1980). Ultimately, however, the choice of remedies is for the Board, provided that the choice made does not rest on insubstantial evidence or erroneous legal standards and does not constitute an abuse of discretion. *See N. L. R. B. v. Gissel Packing Co.,* 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32. To facilitate review under those standards, the Board must support a *Gissel* order by a statement of reasons stating what unfair labor practices the order is intended to redress and indicating in general why traditional remedies are inadequate in the circumstances. *See Justak Bros. & Co. v. N. L. R. B.,* 664 F.2d 1074, 1081–82 (7 Cir. 1981). In this case the Board discussed the particular violations involved and emphasized that "the serious and extensive unlawful activities by the [Company] commenced immediately after the Union began the organization drive and continued unabated right up to the election and even after the election." On this basis, the Board endorsed the administrative law judge's conclusion that the Company's conduct tended to impede the election process and to render a fair rerun unlikely. This statement of reasons is sufficient to permit review and hence withstands the Company's procedural challenge.

■ In our view, the order also comports with the applicable evidentiary and substantive standards and lies well within the Board's discretion. The Company responded to the Union's most recent campaign with threats of plant closure, threats of retaliation against Union activists, and discriminatory discipline aimed at thwarting unionization. As is widely recognized, such conduct tends "to have a lasting inhibitive effect" on employees' formulation and expression of free choice regarding unionization. *N. L. R. B. v. Jamaica Towing, Inc.,* 632 F.2d at 213. It therefore justifies a *Gissel* order unless a very strong showing negates the inference of lasting effects. Because the record in this case reasonably supports such inferences, we cannot substitute our judgment for that of the Board. *See Multi-Medical Convalescent & Nursing Center v. N. L. R. B.,* 550 F.2d 974, 976 (4 Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977). "In fashioning its remedies ... the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32 (citations omitted).

### III.

The Board's findings have substantial evidentiary support and its order was legally sound except as regards its finding that Lowery's conversation with Stephenson in March 1979 violated § 8(a)(1). Because there were other § 8(a)(1) violations to justify the Board's remedial order, it will be enforced.

ENFORCEMENT GRANTED.

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

The majority holds the petitioner guilty of several infractions of the National Labor Relations Act, specifically sections 8(a)(1), (3) and (5). I have no quarrel with the opinion of the Court insofar as it affirms the findings of fact and conclusions of law of the Administrative Law Judge (ALJ) with respect to employer misconduct. However, I cannot accept the Board's imposition of an order requiring petitioner to bargain with a union, such as the respondent, which has failed in two separate election campaigns. In this solicitude for the Union, the majority and the Board forsake the outstanding exaction of this Circuit that such an order have a substantial and demonstrable basis in the evidence. Because the majority explicitly ignores this demand, I dissent.

In *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) the Supreme Court considered the propriety of bargaining orders in three situations. The primary consideration was of those "exceptional" cases marked by "outrageous" or "pervasive" unfair labor practices, regardless of whether the union ever has garnered majority sentiment. Bargaining orders clearly are fitting in those instances because infractions of this gravity "are of 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies with the result that a fair and reliable election cannot be had.'" *Id.* 395 U.S. at 614, 89 S.Ct. at 1940, *quoting N. L. R. B. v. Logan Packing Co.*, 386 F.2d 562, 570 (4th Cir. 1967). Just as clearly, the Court further concluded that

bargaining orders are unsuitable in situations marked by minor, relatively insignificant disobedience having an insignificant effect on elections. "There is no *per se* rule that the commission of any unfair practice will automatically result in a § 8(a)(5) violation and the issuance of an order to bargain." *Id.* 395 U.S. at 615, 89 S.Ct. at 1940. It is the middle position—the so-called category II—which controls here.

In the last-mentioned situation, where the employer has committed "less pervasive [unfair labor] practices which still have the tendency to undermine majority strength and impede ... election processes," the Board is still entitled, in its discretion, to issue a bargaining order provided that the union at one time had a majority. *Id.* 395 U.S. at 614, 89 S.Ct. 1940. The Court stressed that, in the exercise of this discretion, "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." *Id.* Thus the Board must review the extent of past employer misconduct, its effect on elections, and the likelihood of recurrence in determining whether as extraordinary a remedy as a bargaining order is called for.

The General Counsel and the Union each defends on the naked assertion that substantial evidence justifies the order. The Court majority would also sustain the order, but in this it misconstrues the breadth of the Board's discretion.

We have had occasion to gauge the Board's issuance *vel non* of a bargaining order by the criterion of *Gissel*. In *N. L. R. B. v. Appletree Chevrolet, Inc.*, 608 F.2d 988 (4th Cir. 1979), we spoke to the standards the Board must meet in resolving the contentions pro and con. Particularly, the Court emphasized that an election, not a bargaining order, remained the traditional, as well as the preferred, method for choosing the employees' agent. Thus the Board may not so command simply upon its finding an employer guilty of unfair labor practices. *Id.* at 996–97. It is the constant obligation of the Board to explore the efficacy of the common remedies, explain why they would be ineffectual, and assess in

detail what future misconduct, if any, could be anticipated.

This recital of the essential analysis was amplified in our second decision in *N. L. R. B. v. Appletree Chevrolet, Inc.,* 671 F.2d 838 (4th Cir. 1982). There we reiterated that the Board should "make findings sufficient to establish ... the continuing effects of the employer's misconduct and the ineffectiveness of the usual remedies ...." *Id.* at 841.

Even recently, in *N. L. R. B. v. Maidsville Coal Company, Inc.,* 693 F.2d 1119 (4th Cir., 1982), this Court bore down on the principle that "before a bargaining order may issue, the Board must demonstrate, with particularity, why traditional remedies will not protect employees' rights under § 7 of the Act." *Id.* at 1123.

As the petitioner accurately notes, neither the ALJ nor the Board endeavored to explain why a bargaining order would be the appropriate remedy. The Board fails to discuss other remedies and neglects to say what now prevents a fair election. Clearly, the Board has not borne its burden under *Gissel* and *Appletree Chevrolet.* Accordingly, its bargaining order should be refused enforcement.