PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANHEUSER-BUSCH, INCORPORATED,
                    *Petitioner,*

v.                                    No. 02-1740

NATIONAL LABOR RELATIONS BOARD,
                    *Respondent.*

NATIONAL LABOR RELATIONS BOARD,
                    *Petitioner,*

v.                                    No. 02-1897

ANHEUSER-BUSCH, INCORPORATED,
                    *Respondent.*

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(3-CA-21796, 3-CA-21906, 3-CA-22112)

Argued: February 26, 2003

Decided: August 1, 2003

Before WIDENER, KING, and SHEDD, Circuit Judges.

Petition for review denied and cross-application for enforcement granted by published opinion. Judge King wrote the opinion, in which Judge Widener joined. Judge Shedd wrote an opinion concurring in part and dissenting in part.

**COUNSEL**

**ARGUED:** Arthur G. Telegen, FOLEY HOAG, L.L.P., Boston, Massachusetts, for Anheuser-Busch. Christopher Warren Young, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Robert A. Fisher, FOLEY HOAG, L.L.P., Boston, Massachusetts, for Anheuser-Busch. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

**OPINION**

KING, Circuit Judge:

Anheuser-Busch Incorporated ("Busch") petitions this Court for review of a Decision and Order entered against it by the National Labor Relations Board (the "Board"). *Anheuser-Busch, Inc.*, 337 N.L.R.B. No. 2 (Dec. 19, 2001) (the "Order").[1] By its Order, the Board affirmed an earlier decision of an Administrative Law Judge (the "ALJ"), who concluded that Busch, on four occasions, had violated § 8(a)(1) of the National Labor Relations Act (the "Act").[2] The Board has cross-applied for enforcement of its Order. As explained below, we deny the petition for review and grant the Board's cross-application for enforcement.

I.

Busch operates twelve breweries in the United States, including a

---

[1]The Board subsequently made technical corrections and modified, in minor part, its rulings against Busch. *Anheuser-Busch, Inc.*, 337 N.L.R.B. No. 121 (July 5, 2002). In referring to the Order, we are referring to it as modified.

[2]The Act is codified at 29 U.S.C. §§ 151-169, and § 8(a)(1) is codified at 29 U.S.C. § 158(a)(1).

brewery in Baldwinsville, New York (the "Baldwinsville brewery"). At the Baldwinsville brewery, certain of Busch's employees are represented by the Brewery Conference of the International Brotherhood of Teamsters and the International Brotherhood of Teamsters, Local No. 1149 (collectively, the "Teamsters"). In 1998 and 1999, the Teamsters and brewery management engaged in contract negotiations on a new collective bargaining agreement, leading to several controversial incidents at the Baldwinsville brewery. As a result of these incidents, the Teamsters filed a series of charges with the Board, asserting that Busch had committed a host of unfair labor practices. Ultimately, on December 2, 1999, the charges were consolidated into a complaint against Busch (the "Complaint"), issued by the Board's Regional Director for the New York area.[3]

In order to assess the Teamsters's allegations, the ALJ conducted a hearing in Syracuse, New York, from March 8 through 10, 2000. On July 7, 2000, the ALJ issued his decision, making findings of fact and conclusions of law, and preparing a recommended order (the "ALJ Decision").[4] The ALJ concluded that Busch had committed four unfair labor practices involving three employees who worked at the Baldwinsville brewery, specifically, Patrick Lamirande, Joseph Rimualdo, and Brian Meany. After the ALJ Decision was filed with the Board, Busch filed exceptions to it. On review, the Board affirmed the ALJ's findings of fact and conclusions of law, and it adopted his recommended order.[5] Order at 1. As noted above, Busch has petitioned

---

[3]The Teamsters initiated these proceedings by filing charges with the appropriate Regional Director, who decided to issue and prosecute the Complaint. *See* 29 C.F.R. § 101.8 (stating that if charges appear to have merit, Regional Director institutes formal action by issuing complaint and notice of hearing). The Teamsters then participated in the proceedings before the ALJ. *Id.* § 101.10; 102.38. It is appropriate for Busch to have petitioned for review in this Court because the company transacts business in Virginia. *See* 29 U.S.C. § 160(f) (stating that petition may be filed in any circuit where party "transacts business").

[4]The ALJ Decision is published with the Board's Order at 337 N.L.R.B. No. 2 (Dec. 19, 2001).

[5]In resolving a complaint, an ALJ is obliged to set forth his findings of fact and conclusions of law, in addition to preparing a recommended order. 29 C.F.R. § 101.11. An ALJ's decision, including his recom-

for our review of the Order, and the Board has cross-applied for its enforcement. We possess jurisdiction pursuant to 29 U.S.C. § 160(f).

II.

A.  *Incidents Involving Patrick Lamirande*

On December 15, 1998, Teamsters member Patrick Lamirande, a production operator at the Baldwinsville brewery, allegedly obstructed an independent contractor doing work for Busch (the "Contractor Incident"). At approximately 11:15 the following morning, Mark Burlingame and Art Lux, members of the brewery's management, approached Lamirande and began questioning him about the incident. Lamirande promptly requested the presence and assistance of Dan Finn, a shop steward in Lamirande's department, who was already aware of the facts underlying the Contractor Incident.[6] Assuming Finn was at lunch, Burlingame declined this request, calling instead for Fred Vogel, another shop steward in Lamirande's department. Vogel arrived at the site of Lamirande's questioning within fifteen minutes, and after speaking privately with Lamirande, Vogel renewed the request for Finn's presence. Burlingame denied this request, stating that Lamirande should respond to the allegations immediately. Lamirande declined to discuss the matter without Finn, and Burlingame sent him home for the day.

The next morning, December 17, 1998, Lamirande was directed to Burlingame's office for a meeting with management. Upon reporting to the office, he met with Vogel, Burlingame, Lux, Howard Ormsby (a Teamsters business agent), and Ken Silva (a brewery assistant manager). Ormsby, speaking on Lamirande's behalf, requested that

---

mended order, is then filed with the Board. *Id.* If a party files exceptions, the Board reviews the exceptions and issues a decision and order. *Id.* § 101.12(a). If no exceptions are filed, the ALJ's decision and recommended order become the decision and order of the Board. *Id.* § 101.12(b).

[6]A shop steward is a union member who, among other duties, is authorized to act as an employee's representative in an investigatory interview. *See generally* 29 U.S.C. § 402(q).

Finn be allowed to attend the meeting and represent Lamirande, but Silva insisted that Finn's presence was unnecessary. Lamirande was questioned without Finn, and Burlingame thereafter informed Lamirande that he would be disciplined for the Contractor Incident. As a result of these events, the Teamsters filed a charge with the Board, alleging that Busch had committed two unfair labor practices in refusing Lamirande's requests (on December 16 and 17) to be represented by Finn.

In assessing the Teamsters's allegations, the ALJ ruled that, under the Supreme Court's seminal decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), and pursuant to the Board's related precedents, "an employee has the right to specify the representative he or she wants, and the employer is obligated to supply that representative absent some extenuating circumstances." ALJ Decision at 6. Pursuant to this principle, the ALJ concluded that, although Finn may have been eating lunch when Burlingame initially wanted to question Lamirande, Finn was nevertheless "available" as a representative. *Id.* Finn had previously circumscribed his lunch breaks in order to represent employees. In any event, Finn would have completed his lunch break within fifteen minutes of Lamirande's initial request. By its Order, the Board agreed with the ALJ's ruling that Busch had committed two unfair labor practices in denying Lamirande's requests to be represented by a particular shop steward. Order at 1.

## B.  *Incidents Involving Joseph Rimualdo*

In 1987, Joseph Rimualdo, a member of the Teamsters, began working in the packaging, bottling, and shipping department of the Baldwinsville brewery. In 1998, he became a shop steward, and he soon learned of certain safety issues in two other departments of the brewery. In January of 1999, he filed six grievances related to those safety issues. Upon being informed of these grievances, Fred Singler, the manager of Rimualdo's department, met with Rimualdo and the managers of the two departments involved in the safety grievances, Lux and Nick Alivero. In this meeting, Singler asserted that Rimualdo had failed to follow the proper procedures for addressing the safety issues. Rimualdo admitted that this assertion was accurate, and the meeting adjourned. Four days later, upon seeing Rimualdo drinking a Labatt's Blue beer in a tavern near the brewery, Lux said, "This is

two strikes. You got one for filing safety grievances and you got one for drinking Labatt's Blue." ALJ Decision at 11. As a result of this incident, the Teamsters charged Busch with an unfair labor practice, asserting that Lux had threatened Rimualdo for filing safety grievances, an activity protected by the Act.

Before a hearing was conducted on this charge, Rimualdo was involved in another incident at the brewery. On August 25, 1999, Rimualdo, with a group of fellow employees, was hand stamping dates on packages of beer. On that occasion, Rimualdo accidentally got ink on his hands. Lux approached the group and, according to Rimualdo, said, "You got to be careful what you say and what you do around this guy, he's bad news." Lux then stated to Rimualdo: "You got to be pretty good with having ink on your fingers." *Id.* at 12. The latter comment, according to Rimualdo, referred to Rimualdo's recent arrest and fingerprinting in a domestic incident involving his ex-wife. Lux told him, "You made it very tough for me, filing those charges with the [Board]. We'll see in September." *Id.* Rimualdo claimed that, after these statements, Lux threatened to get even with him in some way.[7] Based on this incident (the "Stamping Incident"), the Teamsters, on September 8, 1999, charged Busch with another unfair labor practice charge, alleging that Busch had "interfered with, restrained and coerced Rimualdo in the right to engage in protected, concerted activity by threatening and disciplining him for filing a charge with the [Board]."[8]

---

[7]Other employees, including Dwight Hart and Supervisor Dan Tamulevich, were present during Lux's interactions with Rimualdo. Hart corroborated Rimualdo's version of events, indicating that Lux made remarks about the ink on Rimualdo's hands and that Lux commented on the pending charges before the Board. By contrast, Lux and Supervisor Tamulevich insisted that it was Rimualdo, in making a joke at his own expense, who referred to the ink on his hands. Tamulevich denied that Lux had referred to the grievances Rimualdo had filed or to the upcoming hearing on the two strikes incident.

[8]The Complaint issued by the Board's Regional Counsel revised this allegation slightly, asserting that Busch had threatened Rimualdo because "he had *given testimony* to the Board" during a prior investigation.

As to Lux's comments at the tavern, the ALJ found that they were based on Rimualdo's apparent disloyalty in drinking a competitor's beer, rejecting the Teamsters's assertion that Busch had threatened Rimualdo because he had filed safety grievances. ALJ Decision at 11. The ALJ thus concluded that Lux's comments to Rimualdo at the tavern did not constitute an unfair labor practice. *Id.* On the Stamping Incident, however, the ALJ found that Lux had threatened Rimualdo because of the Teamsters's pending charge before the Board, and he thus concluded that Busch had committed an unfair labor practice. *Id.* at 12. By its Order, the Board agreed with the ALJ's determinations. Order at 1.

## C.  *Incidents Involving Brian Meany*

On February 11, 1999, Teamsters member Brian Meany, an employee in the brewing department of the Baldwinsville brewery, attended a mandatory company communications meeting conducted by Michael Harding, a senior executive from Busch's headquarters in St. Louis. At the outset of Harding's presentation, the brewery's employees were advised that the meeting was for the purpose of discussing Busch's financial performance and that there would be no discussion of collective bargaining or "contract issues." Following his presentation, Harding entertained questions from employees. At that time, Meany criticized Busch for its treatment of workers at the Baldwinsville brewery. At one point, Meany read a list of symptoms of an abused spouse, drawing an analogy to Busch's treatment of its employees. During Meany's commentary, Harding urged Meany to keep his comments brief, but Meany ignored this request.

When Meany reported to work the next day, February 12, 1999, he was advised to find a shop steward and report to Brewmaster Sammartino's office for a meeting with Sammartino and Human Resources Manager Larry Harmon. At the meeting, Sammartino criticized Meany for disrupting the communications meeting, suggesting that, if Meany behaved that way again, he would be removed from the Baldwinsville brewery and disciplined. Sammartino then said, "I want you to know that the work you do on the floor here does not outweigh the things you do in communications meetings. If you speak again at a communications meeting, you will be fired." ALJ Decision at 8. After Meany requested that this restriction be placed in writing, Har-

mon said, "You know what, you will be fired. Then the [Teamsters] will go through the grievance procedure and what will happen will happen." *Id.*

As a result of this incident, the Teamsters charged that Busch had interfered with Meany's right to engage in a protected activity by threatening him for voicing his opinions on collective bargaining issues. As to this charge, the ALJ agreed with the Complaint, concluding that Busch management threatened Meany in reaction to a protected activity and that Busch had thus engaged in an unfair labor practice. *Id.* at 8-9. The Board also affirmed this conclusion, agreeing that Busch had committed an unfair labor practice in its treatment of Meany. Order at 1.

III.

In considering a petition for review, we are obliged to uphold the Board's legal interpretations if they are "rational and consistent" with the Act. *Sam's Club, a Div. of Wal-Mart Stores, Inc. v. NLRB*, 173 F.3d 233, 239 (4th Cir. 1999) (internal quotation marks omitted). Indeed, if the Board's resolution is a "defensible construction of the statute," it is entitled to deference, because the "function of [effectuating] national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the [Board], subject to limited judicial review." *Arrow Auto. Indus., Inc. v. NLRB*, 853 F.2d 223, 237 (4th Cir. 1988) (internal quotation marks omitted). In deciding legal issues, however, the Board should apply its principles consistently. *Sara Lee Bakery Group, Inc. v. NLRB*, 296 F.3d 292, 295 (4th Cir. 2002). And when the Supreme Court has already interpreted a statutory provision, the Board's interpretation and application of the statute will be judged in relation to the Court's rulings. *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536-37 (1992). Findings of fact made by an ALJ and affirmed by the Board are conclusive, so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). And we have characterized substantial evidence as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1269 (4th Cir. 1994) (internal quotation marks omitted).

IV.

We now turn to Busch's contentions that the Board erred in deciding that Busch had committed unfair labor practices in its treatment of Lamirande, Rimualdo, and Meany.[9] First, we assess Busch's position regarding Lamirande's right to a particular union representative. Second, we consider Busch's contentions with regard to the charge involving Rimualdo. Finally, we examine its challenges regarding Meany's activities at the communications meeting.

A.

Busch first challenges the rule articulated by the Board that, absent extenuating circumstances, an employee subjected to an employer's investigation has the right to specify the union representative of his choice (the "Representation Rule").[10] Busch challenges the Representation Rule on three primary bases. First, it contends that the Rule is inconsistent with the Act. Second, it maintains that, even if it is consistent with the Act, the Rule is contrary to the Board's own precedents. Finally, and relatedly, Busch insists that the Rule cannot be applied to this case because of the principle barring retroactive application of the Board's rules.

---

[9]Each of the four unfair labor practices found by the ALJ and the Board involve § 8(a)(1) of the Act, which provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7]." Pursuant to § 7 of the Act, employees have the right to engage in concerted activities "for the purpose of collective bargaining or other mutual aid or protection."

[10]Our dissenting colleague suggests that our shorthand use of the phrase "Representation Rule" refers to a rule we invented in this proceeding. *See ante* at 30. To the contrary, this is the Board's rule. In focusing on our rhetoric, our colleague has obscured the real issue in this case: whether the Board's Representation Rule is "rational and consistent" with the Act. Put differently, we are not assessing whether the Act entitles an employee to choose among available union representatives, but rather whether the Board's interpretation is a "defensible construction of the statute." *Arrow Auto. Indus., Inc.*, 853 F.2d at 237.

1.

To begin with, Busch insists that the Representation Rule is inconsistent with the fundamental purposes of the Act, as interpreted by the Supreme Court in *Weingarten*. According to Busch, the Representation Rule interferes with an employer's legitimate interests in disciplining its workers. Finally, it contends that the statutory basis of *Weingarten* (i.e., that union representation safeguards the collective interests of the bargaining unit) is inapplicable here.

In *Weingarten*, the Supreme Court held that an employee has a right to union representation at any investigatory interview threatening disciplinary action. 420 U.S. at 253. An employer thus commits an unfair labor practice in denying an employee's request for such representation. *Id.* Here, the Board decided that, in light of the Supreme Court's decision in *Weingarten* and the Board's experiences in resolving *Weingarten*-type disputes, an employee is entitled, absent extenuating circumstances, to the union representative of his choice. As explained below, we see the Representation Rule as a reasonable interpretation and application of the Act.

First, the Act — as interpreted by the Supreme Court in *Weingarten* — generally contemplates that an employee will have his choice as to union representation. Indeed, § 1 of the Act provides that the Act's purpose is to protect "the exercise by workers of full freedom of association, self-organization, and *designation of representatives of their own choosing*." 29 U.S.C. § 151 (emphasis added). In *Weingarten*, the Court emphasized that the right to union representation "plainly effectuates the most fundamental purposes of the Act," which is to enable workers to seek mutual aid and protection without undue interference by their employers. 420 U.S. at 262. The choice of a representative plainly furthers the ability of workers to seek such aid and protection.[11]

---

[11]Absent extenuating circumstances, an employer has no interest in selecting between available representatives. By contrast, employees *do* have an interest in selecting between representatives. For example, an employee may know that a representative is already familiar with the investigation, or may generally feel more comfortable with a particular

Second, the Act attempts to rectify the inherent power imbalance of the workplace, and an employee's ability to choose his own union representative serves this goal. When an employee requests union representation in an investigatory interview, the employee is seeking assistance to deal with a "confrontation with his employer." *Id.* at 260. In such a confrontation, the employee is generally at some disadvantage, and the recognition of his right to choose his representative serves, to some extent, to mitigate this inequality. As the Court stated in *Weingarten*, "[r]equiring a lone employee to attend an investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the Act was designed to eliminate." *Weingarten*, 420 U.S. at 262 (internal quotation marks omitted). It is thus reasonable that, absent extenuating circumstances, an employee should be entitled to designate the union representative who will assist him during his employer's investigatory interview.[12]

In this situation, the union had designated two shop stewards in Lamirande's department to serve as employee representatives. When Lamirande initially requested representation by Finn,[13] "no represen-

---

shop steward. In fact, in this instance, one of the reasons Lamirande requested Finn was that Finn was aware of the facts involved in the Contractor Incident. ALJ Decision at 3 (stating that when Vogel first spoke with Lamirande, Lamirande stated: "I would like to see Dan Finn because he is aware of my situation").

[12]In reaching this conclusion, we are not placing an undue burden on employers. An employer need not always summon a requested representative. The employer may deny an employee's request for a particular representative, forego the interview process, and render a decision based on the information it has already obtained. *Weingarten*, 420 U.S. at 258. Or, if extenuating circumstances exist (i.e., if the requested representative is unavailable), the employer may reject the employee's request and proceed accordingly.

[13]Busch asserts that the record fails to support the conclusion that Lamirande requested representation by Finn before Burlingame called for Vogel. Indeed, Busch maintains that the ALJ simply assumed this fact in order to create the current controversy. The ALJ, however, faced with conflicting evidence on this point, was entitled to find, as he did, that Lamirande had requested Finn's presence before Burlingame called for Vogel. ALJ Decision at 4.

tative was present" at the site of the proposed interview. ALJ Decision at 6. Indeed, Vogel was then in another part of the brewery and had to be summoned via radio. *Id.* at 3. Finn was at lunch, but on previous occasions he had circumscribed his lunch breaks in order to represent employees. Additionally, he would have completed his lunch break within fifteen minutes of the outset of the interview. *Id.* at 6. The ALJ concluded that the fact Finn was on his lunch break at the time of the initial request did not render him "less 'available' than Vogel" to represent Lamirande.[14] *Id.* In these circumstances, and in keeping with applicable legal principles, the ALJ did not err in deciding that Busch should have given Lamirande access to the representative of his choice.[15]

---

[14]The ALJ acknowledged that a "short delay" would have resulted *if* Busch, before seeking Finn's presence at the interview, had waited until he completed lunch. ALJ Decision at 6 (emphasis added). However, because Finn had previously circumscribed his lunch breaks to represent employees; because Finn would have finished his break in fifteen minutes; and because the allegations against Lamirande did not demand "instant attention," the ALJ concluded that Busch did not have "sufficient reason to deny Lamirande the representation he wanted." *Id.* Thus, the ALJ found that "the fact that Finn was [at lunch] for a short period of time [did not make] him any less 'available' than Vogel." *Id.* Busch does not maintain that substantial evidence fails to support this finding, and we have no basis for rejecting it. It is difficult to understand our colleague's assertion that "[t]he ALJ clearly erred in deciding that Steward Finn was not less 'available' than Steward Vogel." *Ante* at 27. Our review of findings of fact is limited to whether such findings are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). And, as is often noted, although substantial evidence requires more than a mere scintilla, it is less than a preponderance. *Weis Markets, Inc. v. NLRB*, 265 F.3d 239, 243 (4th Cir. 2001). The ALJ was in a better position to assess the representatives' respective availability, and there is sufficient support in the record to justify the ALJ's finding in this regard.

[15]The Representation Rule may well be consistent with the prevailing industrial practice. *Cf. Weingarten*, 420 U.S. at 267 (reasoning Board's construction was in "full harmony with actual industrial practice"). At a minimum, the Rule is consistent with an agreement between Busch and the Teamsters for future *Weingarten* situations. ALJ Decision at 3; *see also Coca-Cola Bottling Co. of Los Angeles*, 227 N.L.R.B. 1276 (1977)

2.

Busch next contends that the Representation Rule is inconsistent with Board precedent. *See Sara Lee Bakery Group, Inc. v. NLRB*, 296 F.3d 292, 295 (4th Cir. 2002) (holding that Board must apply its principles consistently). In assessing this challenge to the Board's ruling, we note that the Court in *Weingarten* rejected a similar contention regarding the Board's consistency in adhering to precedent. There, the employer pointed to several Board decisions, which had held that a union representative was not required to be present at an investigatory interview. The Court decided that, because an administrative rule normally "involves an evolutionary process," the Board was entitled to modify its rule over time. *Weingarten*, 420 U.S. at 265. The Court observed that it would "misconceive the nature of administrative decisionmaking" to hold "that the Board's earlier decisions froze the development of this important aspect of the national labor law." *Id.* at 265-66.

We agree with Busch that certain of the Board's earlier decisions arguably support the contention that an employee is not entitled to the union representative of his choice. Specifically, in *Coca-Cola Bottling Co. of Los Angeles*, 227 N.L.R.B. 1276 (1977), the Board decided that an employer had not committed an unfair labor practice by refusing an employee's request to be represented by a particular shop steward. In that case, the employee requested representation by a vacationing union representative. The Board decided that, because of the unavailability of the requested representative, the employer had not committed an unfair labor practice in declining to wait for the

---

(stating that, if requested representative had not been on vacation, employer would have adhered to its past practice and granted employee's request for particular representative). The separate opinion suggests that the Board's Representation Rule will discourage employers from conducting investigatory interviews. *Ante* at 28. Congress, however, has decided that such policy concerns are best addressed by the Board. Indeed, our standard of review, i.e., whether the Board's rule is "rational and consistent" with the Act, ensures that the Board, rather than the courts, has the authority to resolve such concerns. *See Arrow Auto. Indus., Inc.*, 853 F.2d at 237.

requested representative to return from vacation. In so concluding, the Board stressed the admonition in *Weingarten* that the right to choose representation should not interfere with an employer's legitimate business interests, such as conducting investigatory interviews without undue delay.

Similarly, in *Pacific Gas & Electric Co.*, 253 N.L.R.B. 1143 (1981), the Board concluded that an employee did not have the right to choose a particular union representative. In that situation, the employer operated two facilities, separated by twenty minutes of driving time. During an interview at one facility, an employee requested a union representative from the other facility, even though the requested representative did not usually represent employees at the interview location. The employer refused this request, instead calling for the representative the union had designated for the facility where the interview was to occur. Given those circumstances, the Board concluded that the employer did not violate the Act by refusing the employee's request. *Id.* at 1144.

Although the Board's *Coca-Cola* and *Pacific Gas* decisions indicate that employees are not entitled to choose a representative, the Board, in more recent decisions, has refined its rule regarding union representation. For example, in *GHR Energy Corp.*, 294 N.L.R.B. 1011 (1989), the Board was faced with a situation where the requested union representative was available. In those circumstances, the Board ruled that the employer had violated the Act in denying an employee his chosen representative. *Id.* at 1042 (finding that the employer's "refusal to permit [an employee] to exercise his right to select a union representative in accordance with the *Weingarten* doctrine . . . violated § 8(a)(1) of the Act"). Thus, by 1989, the Board had firmly indicated that, so long as the requested union representative is reasonably available, an employer should accommodate an employee's request for a particular representative. *See also Consolidation Coal Co., Robinson Run Mine No. 95*, 307 N.L.R.B. 976 (1992) (ruling that employer committed unfair labor practice in denying employee's request when union representative was available and ready to proceed).

Then, in *New Jersey Bell*, 308 N.L.R.B. 277 (1992), the Board again addressed this issue. There, a union attempted to provide an

employee with a particular representative, but the employer ignored the union's choice and picked another representative. The employer contended that, pursuant to *Weingarten*, *Pacific Gas*, and *Coca-Cola*, it was not obligated to provide the employee with the representative selected by the union. The ALJ in *New Jersey Bell* rejected this contention, observing that the Board's decisions in *Pacific Gas* and *Coca-Cola* stood only for the proposition that an employer need not postpone its investigatory interview in order to accommodate an employee's request.[16] The ALJ concluded that the employer was obliged to demonstrate a significant reason for denying the union's request for a particular representative. Because the union's chosen representative was, in the words of the ALJ, "just as available" as the representative selected by the employer, the employer had violated the Act. The ALJ believed that, unless special circumstances exist, an employer has no interest in selecting the representative. On review, the Board adopted a forerunner of the Representation Rule, concluding that: "when two union officials are equally available to serve as a *Weingarten* representative . . . the decision as to who will serve is properly decided by the union officials, unless the employer can establish special circumstances."[17] *Id.*

Thus, by 1992, the Board had taken a firm position that, absent special circumstances (i.e., the requested union representative is unavailable), the choice as to who will represent an employee during an investigatory interview resides with the union and the employee, not the employer.[18] Beginning in 1977 with its *Coca-Cola* decision,

---

[16]The ALJ in *New Jersey Bell* also distinguished *Pacific Gas* because the *Pacific Gas* employee had requested a representative who did not normally represent employees at the interview location, and the union already had a system in place whereby an on-site representative was available.

[17]In *New Jersey Bell*, the Board disagreed with the ALJ's determination that the employer had violated the Act. It concluded that, because the requested representative had exceeded the scope of representation in a prior interview, the employer had established special circumstances for its denial.

[18]In support of its position here, Busch also relies on the Board's decisions in *Williams Pipeline Co.*, 315 N.L.R.B. 1 (1994) and *LIR-USA Manufacturing, Co.*, 306 N.L.R.B. 298 (1992). In *Williams Pipeline Co.*,

the Board has simply "modified and reformed its standards on the basis of accumulating experience," as authorized and approved by the Court in *Weingarten*. In such circumstances, we are constrained to conclude that the Representation Rule is consistent with Board precedent.

3.

Busch also asserts that the Representation Rule cannot be applied to this case because it would be a retroactive application of the Rule. *See ARA Serv., Inc. v. NLRB*, 71 F.3d 129, 135 (4th Cir. 1995) (stating that Board cannot retroactively apply new rules). At the time of its *Coca-Cola* and *Pacific Gas* decisions, the Board had not decided that an employee is entitled to the union representative of his choice. Since then, however, the Board has refined its approach to union representation, developing its present position over the course of many years and several decisions. In light of these developments, the Representation Rule does not signify a substitution of new law for old law. *See ARA Serv., Inc.*, 71 F.3d at 135 ("[Only w]hen a Board decision creates a new rule . . . by overruling past precedents relied upon by the parties [is] the propriety of its retroactive application called into question."). In sum, we conclude that the Board appropriately found Busch to have committed unfair labor practices by failing to accommodate Lamirande's requests for a particular representative.[19]

---

however, the Board merely recognized that an employer does not have to postpone an investigatory interview when another union representative is available. 315 N.L.R.B. at 5. And in *LIR-USA*, the ALJ simply noted that an employer is not obligated to accommodate an employee's request when a requested representative is unavailable. 306 N.L.R.B. at 302. Neither of these decisions is contrary to the Representation Rule.

[19]Busch also asserts that the record does not support the ALJ's finding that Lamirande personally requested Finn's presence on December 17, 1998. That Lamirande's request was voiced by Lamirande's representatives on December 17, 1998, does not alter the fact that Lamirande had personally requested Finn's presence on the prior day. In these circumstances, the ALJ was entitled to find that Lamirande had requested Finn's presence on December 17th, even though his request was technically made through a union official.

B.

On the Board's disposition of the charges relating to Rimualdo, Busch challenges the Order in two respects. First, it contends that the Board violated its due process rights by finding an unfair labor practice that was not alleged in the Complaint. Second, it maintains that the ALJ's finding regarding Lux's threat to Rimualdo is not supported by substantial evidence. We assess these contentions in turn.

1.

In their initial charge, the Teamsters alleged that Busch "interfered with, restrained and coerced Rimualdo in the right to engage in protected, concerted activity by threatening and disciplining him *for filing a charge* with the [Board]." The Complaint, by contrast, alleged that, on August 25, 1999, Busch (through its agent Lux) "threatened an employee with unspecified reprisals because the employee had *given testimony* to the Board during a prior investigation." After the hearing, the ALJ found that Busch had threatened Rimualdo for causing the Teamsters *to file* an unfair labor practice charge in connection with the two strikes incident. The ALJ's conclusion tracks the language of the initial charge that the Teamsters filed with the Board (and served on Busch) rather than the allegation of the Complaint. Busch asserts that, in these circumstances, it was denied due process because the ALJ's finding had no foundation in the Complaint.

In similar circumstances, we rejected an employer's challenge — based on a due process contention — that the Board had found an unfair labor practice not alleged in the complaint. In *Standard-Coosa-Thatcher Carpet Yarn Division v. NLRB*, 691 F.2d 1133, 1136 n.3 (4th Cir. 1982), the Board's General Counsel charged that an employer had threatened its employee with a loss of benefits if she voted in favor of a union. After hearing and considering evidence, the ALJ and the Board concluded that the employer had actually enticed the employee with a promise of benefits if she voted against the union. The employer objected to this finding, asserting that it was at variance with the complaint. We disagreed, concluding that the employer had ample notice that an unfair labor practice was alleged with respect to the specific conversation between the employer and the employee. Thus, the employer had received due process in the

Board proceeding even though the ALJ's finding was phrased differently from the allegation of the complaint. *Id.* (citing *NLRB v. Tamper, Inc.*, 522 F.2d 781, 790 (4th Cir. 1975)).

The principle established in *Standard-Coosa-Thatcher* is controlling here. Busch was on notice that Lux's comments to Rimualdo during the Stamping Incident formed the gravamen of the unfair labor practice charge set forth in the Complaint. Indeed, four separate witnesses testified about the Stamping Incident, and the content and context of Lux's comments to Rimualdo were fully litigated. As in *Standard-Coosa-Thatcher*, the ALJ and the Board were entitled to articulate their findings in a manner that comported with the evidence. *Standard-Coosa-Thatcher*, 691 F.2d at 1133 n.3. In these circumstances, Busch received ample notice that it was being charged with an unfair labor practice because of Lux's statements on August 25, 1999, in connection with the Stamping Incident. Thus, Busch received all the process it was due.

2.

Busch next contends that the record fails to support the ALJ's finding that Lux threatened Rimualdo for engaging in protected activity. Under § 8(a)(1), the filing of "grievances and Board charges are protected activities under the Act." *Equitable Gas Co., Div. of Equitable Res., Inc. v. NLRB*, 966 F.2d 861, 866 (4th Cir. 1992) (citing 29 U.S.C. § 157 and *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 836, (1984)). An employer thus "violates § 8(a)(1) by threatening reprisals for engaging in such protected activity." *Id.* (citing *NLRB v. U.S. Postal Serv.*, 906 F.2d 482, 486 (10th Cir. 1990)). Here, the ALJ decided that Lux was threatening Rimualdo because of the pending charges before the Board. In so concluding, the ALJ simply credited Rimualdo's and Hart's versions of the Stamping Incident, rejecting the conflicting evidence offered by Busch. When an administrative record is fraught with conflicting testimony, we are obliged to defer to the Board's resolution of such conflicts. *See NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983). We are thus constrained to conclude that the ALJ's finding — i.e., that Lux threatened Rimualdo for engaging in protected activity — is supported by substantial evidence.

## C.

Finally, Busch raises two challenges to the Board's conclusion that it committed an unfair labor practice with respect to Brian Meany. First, it contests the ALJ's finding that Meany engaged in protected activity during the communications meeting. Second, it maintains that the Order and remedial notice are overly broad. We assess each of these contentions in turn.

### 1.

On the evidentiary issue, the record amply supports the ALJ's finding that Meany was engaged in protected conduct during the communications meeting. ALJ Decision at 8-9. When an employee makes comments or asks questions of his employer concerning working conditions, he is unquestionably engaging in protected activity. *See Consumer Prod. Co.*, 282 N.L.R.B. 130, 132 (1986). An employee, however, can lose the Act's protections if his "conduct is so egregious as to take it outside the protection of the Act, or of such a character as to render the employee unfit for further service." *Id.* In support of its contention on this issue, Busch relies primarily on the Board's decision in *Eagle Picher Industries, Inc.*, 331 N.L.R.B. 169 (2000). There, the employer instructed his employees to hold questions until the end of a company presentation, but an employee disobeyed the instruction and continuously interrupted the presentation. In its decision, the Board concluded that the employee's conduct was not protected by the Act.

This case presents a factual setting that differs materially from *Eagle Picher*. The communications meetings sponsored by Busch were mandatory for all employees. At the end of each meeting, Busch allowed its employees to ask questions. As the ALJ concluded, an employer should reasonably expect unfavorable questions or statements in such situations. ALJ Decision at 8-9. In the communications meeting, Meany did not interrupt Harding's presentation. Indeed, he waited until Harding recognized him for a question before discussing issues concerning employee morale. The record thus supports the Board's conclusions that Meany's comments were not inappropriate, much less egregious, and that he was engaged in protected activity. Order at 1.

2.

Busch also asserts that the remedy crafted by the Board is over-broad, in that it is not properly tailored to fit the unfair labor practice it was intended to redress. *See Ultrasystems W. Constructors, Inc. v. NLRB*, 18 F.3d 251, 258 (4th Cir. 1994). By its Order, the Board required the posting of a notice advising Baldwinsville brewery workers that Busch was prohibited from threatening to "discharge an employee if he or she engages in a concerted protected activity, including engaging in such activity when speaking at corporate communications meetings." Order at 1. It is elementary that the Board possesses broad discretion in crafting its orders, *Ultrasystems*, 18 F.3d at 258, and there is no requirement that such an order be tailored so as to preclude only the unlawful conduct arising from a particular incident or employee. *NLRB v. Mexia Textile Mills*, 339 U.S. 563, 568 (1950). In these circumstances, and in light of these principles, the terms of the Order are not overbroad.

V.

Pursuant to the foregoing, we deny Busch's petition for review and grant the Board's cross-application for enforcement.

*PETITION FOR REVIEW DENIED AND CROSS-APPLICATION FOR ENFORCEMENT GRANTED*

SHEDD, Circuit Judge, concurring in part and dissenting in part:

I concur in the part of the majority opinion denying Busch's petition for review and granting the Board's cross-application for enforcement as to the Rimauldo and Meany incidents. I dissent, however, from the majority's denial of Busch's petition for review and its grant of the Board's cross-application for enforcement relating to the two Lamirande incidents.

I dissent for several reasons. Most important, the majority's "Representation Rule" exceeds the scope of § 7 of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 157. Also, under the particular facts of this case, Busch afforded Lamirande all

the important protections that § 7 and the *Weingarten* rule were intended to provide. Moreover, the majority's "Representation Rule" actually tends to undermine the protections afforded by the *Weingarten* rule.

I.

The majority's "Representation Rule" impermissibly expands the right first announced by the Supreme Court in *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251 (1975).[1] The employer in *Weingarten* accused one of its employees of stealing. The employer's security agent interviewed the employee about the allegations. Although the employee repeatedly requested a union steward to assist her during the interview, the security agent refused. After verifying the employee's defense, the security agent apologized to the employee and assured her that the matter was closed.

Relieved, the employee burst into tears and made a seemingly incriminating statement about a separate matter. The security agent immediately launched yet another investigatory interview. The employee again asked for a union steward, but the agent again denied the request.

The Supreme Court held that a union employee is entitled to have union representation during an investigatory interview that the employee reasonably believes might result in disciplinary action. *Id.* at 262. This proposition has generally become known as the "*Weingarten* right" or the "*Weingarten* rule." *See*, *e.g.*, B. Glenn George, *Visions of a Labor Lawyer: The Legacy of Justice Brennan*, Wm. & Mary L. Rev. 1123, 1171 (1992). The Court in *Weingarten* based its

---

[1]The majority insists that the "Representation Rule" is the Board's invention rather than its own. *Ante* at 9, n.10. The majority's insistence on this somewhat semantical point is curious. First, the majority, not the Board, coined the phrase "Representation Rule." Second, even though the majority may not have "invented" the "Representation Rule," the majority has placed its imprimatur on the new rule by finding it to be rational and consistent with the Act. Third, future litigants seeking protection or further extension of the "Representation Rule" will surely cite the majority's opinion rather than the Board's order.

conclusion on the provisions of § 7 of the Act, the same provision at issue in this case. Section 7 states in pertinent part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .* (Emphasis added).

The Court reasoned that an employee's right to union representation during an investigatory meeting is based on the guarantee that employees have under § 7 to act in concert "for mutual aid or protection." *Weingarten*, 420 U.S. at 260.

In wrestling with the seeming inconsistency between the statutory language, on one hand, which is aimed at "concerted" activity and "mutual" aid and protection, and the individual employee's claim, on the other hand, that she had been deprived of union representation during an investigatory meeting, the Court explained:

> The union representative whose participation [the employee] seeks is, however, safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of imposing punishment unjustly. The representative's presence is an assurance to other employees in the bargaining unit that they, too, can obtain his aid and protection if called upon to attend a like interview. Concerted activity for mutual aid or protection is therefore . . . present here.

*Id.* at 260-61.

The Court found that providing a union representative during an investigative interview effectuates some of the primary purposes of § 1, 29 U.S.C. § 151, of the Act.[2] *Id.*, at 262. Such protection, the

---

[2]The majority's suggestion that § 1 grants an individual employee his personal choice of union representation, *see ante* at 10, is misplaced.

Court reasoned, is consistent with the Act's goal of eliminating the "inequality of bargaining power between employees . . . and employers." As Justice Brennan explained for a majority of the Court:

> A single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview.

*Id.* at 262-63. Thus, the Court found that affording a "lone employee" a union representative during an investigatory interview in which the risk of discipline reasonably inheres falls within the protection of § 7 "read in the light of the mischief to be corrected and the end to be attained." *Id.* at 262.

By enforcing the Board's decision in this case, the majority establishes a new right for individual employees that is untethered from § 7 of the Act and is not envisioned by *Weingarten*. Whereas the *Weingarten* rule and § 7 are designed to allow employees "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection," the majority's "Representation Rule" fails to effectuate any collective right of employees. Instead, the majority's holding guarantees each individual employee the right to choose a particular union representa-

---

Section 1 declares it the policy of the United States to eliminate hindrances to the "free flow of commerce" generally by encouraging collective bargaining and "the exercise by workers of full freedom of association, self-organization, and *designation of representatives of their own choosing*." 29 U.S.C. § 151 (emphasis added). This right to designate representatives arises in the context of the collective activities of workers in a group. As Justice Marshall explained in a case decided the day before *Weingarten*, the NLRA, to secure the collective strength of the bargaining unit, establishes a regime of majority rule wherein the rights of some individuals might be subordinated to the interests of the majority. *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50 (1975).

tive he or she desires, even when, as is in the instant case, that particular representative is not as available as another competent and duly elected union representative and when the employee has no material basis for insisting on one particular representative over another.[3] This new right that the majority creates does not advance the collective interests of the bargaining unit.

The majority asserts that granting an individual employee the right to demand one qualified, duly elected steward over another will help mitigate the inequality between employer and employee and will make the employee "generally feel more comfortable." *See ante* at 10, n.11. As for the first purported justification, if both stewards are competent and duly elected by the bargaining unit, allowing the individual employee to choose one over the other does not benefit the collective interests of the bargaining unit in the slightest. One competent, duly elected steward mitigates the inequality between employer and employee just as much as any other steward. As for the second purported justification, making an individual employee "generally feel more comfortable" is not the important type of right that § 7 and the *Weingarten* rule are intended to protect.[4]

---

[3]There are, no doubt, instances when an employee would have a material reason for preferring one representative over a proffered representative. If, for instance, the employee and the proffered representative have a long history of animosity toward each other, the employer, after being informed of this circumstance, should replace the proffered representative with another representative. This replacement would be required not only because the proffered representative would be biased against the individual employee but also because the proffered representative's bias could affect his ability to represent the interests of the unit as a collective whole during the investigatory interview. No such circumstance exists in this case. If it had, it would be consistent with the *Weingarten* rule and § 7 to require the replacement "in the light of the mischief to be corrected and the end to be attained."

[4]The majority also asserts that the "Representation Rule" is justified because it would allow an employee to choose a steward who is already familiar with his case. That simply is not the type of important right protected by *Weingarten*. In fact, the ALJ in this case found it unimportant that a particular steward might already be "up to speed." J.A. 13. The type of prompt, nonadversarial interview envisioned by *Weingarten* does not require that a steward have in-depth knowledge about the incident under review.

The *Weingarten* rule stands for the weighty proposition that an employee should not be forced to undergo an investigatory interview without the assistance of a union steward, who ensures that both the employee and the bargaining unit are treated justly. The majority's new rule does not advance the interests of the bargaining unit as a whole. Therefore, the "Representation Rule" exceeds the scope of § 7 of the Act and is an impermissible extension of the *Weingarten* rule.[5] *See Maislin Industries v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning.").[6]

---

[5]We are obliged to uphold the Board's interpretation of a statute only if it is rational and consistent with the Act. *See Sam's Club v. N.L.R.B.*, 173 F.3d 233, 238 (4th Cir. 1999). Reviewing courts are not to stand aside and rubber stamp Board determinations that are contrary to the language or tenor of the Act. *Weingarten*, 420 U.S. at 266.

[6]Moreover, I dissent because the majority's "Representation Rule," even if it could be construed as a permissible interpretation of § 7, cannot be enforced retroactively against Busch. An important consideration in determining whether to give retroactive application to a new rule is deciding whether the rule proposed is an "abrupt break with well-settled policy" or is merely an "attempt to fill a void in an unsettled area of law." *ARA Services, Inc. v. N.L.R.B.*, 71 F.3d 129, 134 (4th Cir. 1995).

The Board's most recent pronouncement in a *Weingarten* rule case was *Williams Pipeline Co.*, 315 N.L.R.B. 1 (1994). In *Williams*, the employee being investigated asked for a union steward who was not immediately available. In deciding the case, the Board reaffirmed its prior decision in *Coca-Cola Bottling Co.*, 227 N.L.R.B. 1276 (1977). In *Coca-Cola*, the Board held that an employer is not required to postpone an investigatory hearing when the employee asks for a particular union representative who is unavailable, if there is another qualified union representative available.

Because *Williams* was the most recent decision by the Board prior to the Lamirande incident, Busch was entitled to rely on it and the prior Board decisions, like *Coca-Cola*, consistent with it. Therefore, even if the majority's "Representation Rule" were a permissible interpretation of § 7, it constitutes an abrupt reversal of prior policy that may not be applied retroactively.

## II.

I also dissent because the facts of this case reveal that Busch afforded Lamirande all the important protections that § 7 of the Act and the *Weingarten* rule provide. Lamirande, who soon before this incident was elected as a union steward,[7] was accused of endangering the safety of other workers at the Busch plant. Busch chose to interview Lamirande about the incident, even though it was not required to under the law. Instead, it could have immediately commenced a disciplinary proceeding. *See Weingarten*, 420 U.S. at 259.

Lamirande asked that Steward Finn be called to represent him during the interview. Instead, Steward Vogel was summoned to the meeting to represent Lamirande. Busch did not summon Steward Finn because he was scheduled to be at lunch. The ALJ found that Busch had a logical reason for not calling Steward Finn. He also found that both Steward Vogel and Steward Finn were competent stewards, and that Busch had no ulterior motive in wanting Steward Vogel to represent Lamirande rather than Steward Finn. Steward Vogel was duly elected by the workers in Lamirande's department and had regularly represented workers during investigatory interviews.

Once Steward Vogel arrived, he was given an opportunity to speak privately with Lamirande. Lamirande told him that he preferred Steward Finn because he was already "aware of my situation." J.A. 10. There is no evidence in the record, however, that Steward Finn was aware of Lamirande's situation until after the first interview. The ALJ also found that Lamirande never told Busch any reason why he wanted Steward Finn rather than Steward Vogel to represent him. As the ALJ found: "Lamirande asked for union representation and got it promptly." J.A. 11.

The ALJ assumed that the interview began at 11:15 a.m. and that, had the interviewer granted Lamirande's request for Steward Finn, the interviewer would have had to wait only 15 minutes until Steward Finn returned from lunch. The ALJ found that this "short delay" was not a sufficient reason to deny Lamirande's request.[8] The ALJ found

---

[7]His term as steward commenced the month after this incident.

[8]The ALJ also decided that Busch should have delayed the interview and that nothing about the circumstances required instant attention. Busch asserts correctly that these are legitimate prerogatives reserved to the employer under *Weingarten*.

that, even though Steward Finn was on lunch break, he was not any less "available" than Steward Vogel. J.A. 13.

The ALJ clearly erred in deciding that Steward Finn was not less "available" than Steward Vogel. The interview began before Steward Finn was scheduled to return from lunch. The interviewer was prepared to proceed when Steward Vogel was present but Steward Finn was not.[9] Steward Finn was not "equally available" as Steward Vogel.[10]

At no time during the course of these interviews did anyone suggest that it was a *Weingarten* violation for Busch to provide Steward

---

[9]The majority contends that three prior Board decisions on which it relies require only that the requested representative be "reasonably" available. *Ante* at 14. This characterization is incorrect. In *GHR Energy Corp.*, 294 N.L.R.B. 1011 (1989), the requested representative arrived at the interview before the representative proffered by the employer. In *New Jersey Bell Telephone Co.*, 308 N.L.R.B. 277, 282 (1992), and *Consolidation Coal Co.*, 307 N.L.R.B. 976, 978 (1992), the requested representatives were "equally available" and "present and ready to go forward."

The majority's mischaracterization is further evidenced by the Board's decision in *LIR-USA Manufacturing Co.*, 306 N.L.R.B. 298 (1992). In that case, the Board did not give any weight to the employee's preference for one steward over another steward when the requested steward was not available within five minutes.

[10]The majority asserts that the ALJ was in a better position to assess the respective availability of the two stewards and therefore substantial evidence exists in the record justifying the ALJ's finding that Steward Finn was not less "available" than Steward Vogel. *Ante* at 12, n.14.

"Availability" has had a distinct meaning under the *Weingarten* rule cases. For example, a particular steward is "available" when he or she is "present and ready to proceed." See cases cited *ante* at 27, n.9.

The ALJ ignored this accepted definition. Instead, the ALJ found that Steward Finn was no less "available" because he could have been present after a "short delay."

The only evidence in the record, however, is that Steward Finn was not present and ready to proceed when Steward Vogel was present and ready to proceed. Thus, there is no evidence to support the ALJ's finding that Steward Finn was no less "available."

Vogel rather than Steward Finn. In fact, it was not until after the Region refused the union's request to issue complaint over Lamirande's suspension that the *Weingarten* issue was raised.

To suggest that Busch somehow tried to intimidate or overpower Lamirande or tried to disadvantage him during the two interviews by not allowing him to have Steward Finn as his representative lacks any support in the record. There was clearly no "mischief to be corrected" by having Steward Finn rather than Steward Vogel represent Lamirande. All the underlying policy reasons for the *Weingarten* rule were attained, *i.e.*, Steward Vogel safeguarded not only the particular interests of Lamirande but also the interests of the entire bargaining unit by ensuring "that [Busch did] not initiate or continue a practice of imposing punishment unjustly." *Weingarten*, 420 U.S. at 260-61. Because Lamirande was competently represented in both interviews by a duly elected steward, he was not the "lone employee" whom *Weingarten* and § 7 protect.

## III.

Finally, the majority's "Representation Rule" is inconsistent with the important protections the *Weingarten* rule was intended to foster. As the majority rightly notes, an employer is not obligated to summon a particular steward requested by an employee under any circumstance. *Ante* at 10-11, n.11. Instead, the employer has the prerogative to forgo the interview process altogether and proceed to discipline the employee immediately. The Court in *Weingarten* understood the disadvantages of this scenario. By establishing the *Weingarten* rule, the Court attempted to create a policy that was "useful to both employee and employer." *Weingarten*, 420 U.S. at 262. The Court explained the benefit of the rule:

> A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview. Certainly his presence need not transform the interview into an adversary contest. Respondent suggests nonetheless that union representation at this stage is unnecessary because a decision as to employee culpability or disciplinary action can be corrected after the

decision to impose discipline has become final. In other words, respondent would defer representation until the filing of a formal grievance challenging the employer's determination of guilt after the employee has been discharged or otherwise disciplined. At that point, however, it becomes increasingly difficult for the employee to vindicate himself, and the value of representation is correspondingly diminished. The employer may then be more concerned with justifying his actions than re-examining them.

*Id.* at 263.

The "Representation Rule" adds an unnecessary complication to what the Court envisioned as a streamlined system of dispute resolution. Instead of "getting to the bottom of the incident occasioning the interview," the new rule announced today will inevitably give rise to new disputes like what constitutes an "extenuating circumstance" and how long must the interviewer wait before proceeding with the interview. These disputes will arise even in cases like this one, where the employee demanding a particular representative will receive no additional benefit from and has no material reason for making such a demand. Employers may well find it much more desirable to bypass the interview process and proceed to discipline. This result is inconsistent with the goals of the *Weingarten* rule and § 7 of the Act.[11]

---

[11]The majority suggests that it lacks authority to stop such an undesirable result, because Congress has delegated such policy considerations to the Board. *Ante* at 12-13, n.15. As previously explained, *ante* at 25, the court is not allowed to merely rubber stamp the Board's interpretation of a statute. Instead, a court must judge an agency's interpretation against the Supreme Court's prior determination of the statute's meaning. *Maislin Industries*, 497 U.S. at 131. In *Weingarten*, the Supreme Court clearly promoted the investigatory interview as a prompt, efficient, desirable means of handling disputes for both the employer and the employee. *Weingarten*, 420 U.S. at 262-63. The "Representation Rule" might cause employers to bypass the interview process and thereby disadvantage employees. This potential further suggests that the "Representation Rule" is not a permissible interpretation of the Act.

## IV.

Today, the majority coins the phrase "Representation Rule" to designate the new rule that it announces. This redesignation is warranted because the "Representation Rule" is an impermissible extension of the *Weingarten* rule.

For all of the above reasons, I respectfully dissent from the majority's denial of Busch's petition for review and its grant of the Board's cross-application for enforcement as to both of the Lamirande incidents. The majority's new "Representation Rule" exceeds the reach of § 7 of the Act.